1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   Post Montgomery Center
3  One Montgomery Street, Suite 1800
   San Francisco, CA  94104
4  Telephone:  415/288-4545
   415/288-4534 (fax)
5  shawnw@rgrdlaw.com
        – and –
6  DARREN J. ROBBINS (168593)
   TRAVIS E. DOWNS III (148274)
7  BRIAN E. COCHRAN (286202)
   655 West Broadway, Suite 1900
8  San Diego, CA  92101-3301
   Telephone:  619/231-1058
9  619/231-7423 (fax)
   darrenr@rgrdlaw.com
10 travisd@rgrdlaw.com
   bcochran@rgrdlaw.com
11
   Attorneys for Plaintiff
12
                    UNITED STATES DISTRICT COURT
13
                    NORTHERN DISTRICT OF CALIFORNIA
14

| | |
|---|---|
| 15  MALAKYAR VERNET, Individually and on ) Behalf of All Others Similarly Situated, )  | Case No. |
| 16                            Plaintiffs, ) | CLASS ACTION |
| 17        vs.                             ) | COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE |
| 18  THE WE COMPANY, ADAM NEUMANN, ARTHUR MINSON, MICHAEL GROSS, ) | |
| 19  LEWIS FRANKFORT, BRUCE DUNLEVIE, ) M. STEVEN LANGMAN, JOHN ZHAO, ) | |
| 20  MARK SCHWARTZ, RONALD D. FISHER and SOFTBANK GROUP CORP., ) | |
| 21                            Defendants. ) | |
| 22 _____ ) | DEMAND FOR JURY TRIAL |

23

24

25

26

27

28

Plaintiff Malakyar Vernet ("plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon an investigation conducted by and through counsel, which included, among other things, a review of The We Company's ("WeWork" or the "Company") financial records and investor presentations; financial analysis, media reports and releases by and about WeWork; and filings in litigation involving WeWork.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a class action on behalf of purchasers of WeWork securities between May 15, 2017 and September 30, 2019 (the "Class Period") against WeWork and the Company's current and former senior executives, directors and controlling shareholders for violations of California Corporations Code §§25400(d), 25401, 25500, 25501 and 25504.

2.      WeWork is a private commercial real estate company that specializes in the provision of shared workspace for technology startups and other enterprises.  Founded in 2010 by defendant Adam Neumann ("Neumann"), his wife Rebekah Neumann, and Miguel McKelvey, the Company maintained dual headquarters in San Francisco and New York City.

3.      WeWork leases office space in commercial buildings, usually under longer contract terms (averaging 15 years), and then subleases these spaces at higher prices to subtenant businesses on shorter, more flexible contract terms.  The Company designs and refurbishes these spaces in order to foster a sense of shared office "community" within the Company's brand aesthetics. WeWork offices became renowned for offering amenities such as free beer, baristas, foosball tables, and other communal perks.  In addition to charging tenants a premium for contract flexibility and the Company's trademark amenities, WeWork generated higher revenues by designing spaces to allow for more workers within the same office footprint.

4.      Defendant Neumann, WeWork's former Chairman and Chief Executive Officer ("CEO"), served as the Company's primary brand ambassador and driving creative force. According to defendant Neumann and the other defendants, WeWork was far more than a commercial real estate company.  Rather, the Company's technological and data-focused approach

to designing communal office spaces purportedly offered a transformational reordering of the way people work and interact.  WeWork claimed it offered a "physical social network," with a mission "to elevate the world's consciousness," providing its members not only "with flexible access to beautiful spaces," but also "a culture of inclusivity and the energy of an inspired community, all connected by [the Company's] extensive technology infrastructure."  WeWork, defendants claimed, had "the power to elevate how people work, live and grow."

5.    In defendants' statements to investors, WeWork's financial results and growing business empire appeared to support these expansive claims.  Defendants highlighted WeWork's stunning growth and prospects.  Between 2016 and 2018, WeWork reported annual revenues that quadrupled, from $436 million to more than $1.8 billion.  Defendants also claimed that WeWork office locations commanded healthy profit margins, that its community membership and occupancy metrics had soared, that the Company was extracting more revenue per member on a constant-city basis, and that it was poised for rapid revenue growth and on a sustained path to profitability.

6.    Although the Company incurred substantial losses, WeWork executives reassured investors that these losses were all part of the Company's controlled expansion plans and growth investment strategy.  Defendants claimed that WeWork's core business remained highly profitable and that investments in growth initiatives were laying the foundation for a profitable future once WeWork achieved market dominance, much like other successful technology startups such as Amazon, Inc. and Netflix, Inc. had done.  As WeWork expanded into non-real estate ventures like education, messaging apps, and a coding platform, defendants claimed that the Company was on the vanguard of revolutionizing a host of industries through its communal approach to goods and services.  Defendant Neumann called it the "We Generation," which he said would profit from the philosophy that "being part of something greater than yourself is meaningful."

7.    Defendants told a story of transformational growth for the purpose of offering and selling hundreds of millions of dollars' worth of WeWork securities at inflated valuations.  By January 2019, WeWork was valued at $47 billion, making it one of the most highly valued private

1  startups in the world.  Around this same time, WeWork began pursuing an initial public offering

2  ("IPO"), which would allow it to offer and sell billions more to the investing public.

3         8.     However, while defendants claimed that WeWork's losses represented controlled

4  growth and strategic investment spending that would lay the foundation for profitability, the exact

5  opposite was true.  As would later be revealed, WeWork was engaged in profligate spending in a

6  reckless bid for growth at all costs – not in a manner designed to sustainably grow its business, but

7  rather to induce capital raises from investors at ever higher valuations.  The Company has since

8  admitted as much.  In an October 2019 slide presentation, after shocking details emerged of the

9  Company's behind-the-scenes excess in the course of its failed IPO bid, WeWork acknowledged

10  it had eschewed a disciplined focus on profitable market expansion during the Class Period and

11  instead strove to "[g]row business commitments prior to funding commitments."  In other words,

12  WeWork expanded its business empire not because it made business sense, but for the primary

13  purpose of inducing additional investment in the Company.

14         9.     As WeWork attempted to transition to public markets, regulatory, media and

15  investor scrutiny became focused on the Company's financial position and business operations.

16  That sunlight proved to be a harsh disinfectant, exposing the Company's use of fanciful accounting

17  metrics to obscure its true financial condition, such as "community-adjusted EBITDA," which

18  excluded marketing, general and administrative as well as development and design costs from its

19  calculations.  In 2019, after defendants had used this metric to sell millions of dollars' worth of

20  WeWork securities, the U.S. Securities and Exchange Commission ("SEC") rejected it as

21  misleading.  Additional disclosures required by the SEC further exposed the Company's precarious

22  finances and rampant insider dealing.  Biting exposés by investigative journalists and industry

23  analysts revealed even more details about the Company's inner workings, including that WeWork

24  had grown with reckless abandon and squandered investor money on Neumann's personal pet

25  projects without any business rationale and oftentimes simply to serve his lavish, drug-fueled

26  lifestyle.  One reporter characterized WeWork's operations as a "monetary bonfire."

27        10.    In the face of these revelations, from August 2019 onward, the value of WeWork

28  securities plummeted.  On September 30, 2019, the Company officially pulled the plug on its IPO

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE    - 3 -

in what was described as "one of the most spectacular flameouts in recent corporate history." By November 2019, WeWork was valued at less than $5 billion, a stunning **90% decline** in less than a year that devastated the Company's investors. Bonds sold in April 2018 for $700 million have traded at **less than 35 cents** on the dollar. By contrast, defendant Neumann received one of the most lavish golden parachutes of all time, despite the wreckage he had wrought: a $1.7 billion buyout package carefully crafted between and amongst defendants.

11. Plaintiff and members of the Class (as defined below) have suffered significant losses as a result of defendants' violations of the California Corporations Code as detailed herein. This lawsuit seeks recompense for those losses.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332, as this is a class action where at least one of the members of the Class is a citizen of a state different from at least one of the defendants, and the matter in controversy exceeds the sum or value of $5,000,000.

13. Venue is proper in this judicial district under 28 U.S.C. §1391, because: (1) one or more defendants reside in this District; and (2) a substantial part of the events or omissions giving rise to the claims occurred in this District. WeWork maintained corporate headquarters in San Francisco and certain of the Individual Defendants reside in California. Defendants prepared the false and misleading statements complained of herein in substantial part in California, the statements relate in substantial part to WeWork's California operations (including real property located in California), the statements were used to induce the investment in WeWork securities by California residents, and the statements were disseminated in California and to members of the Class who reside in California.

## INTRADISTRICT ASSIGNMENT

14. A substantial part of the events or omissions which give rise to the claims in this action occurred in the county of San Francisco, and as such this action is properly assigned to the San Francisco division of this Court.

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE

**THE PARTIES**

15.     On April 30, 2019, plaintiff Malakyar Vernet purchased shares of WeWork Class A common stock and was damaged thereby.

16.     Defendant WeWork is a real estate and office-sharing company.  The Company is co-headquartered in San Francisco and New York City.

17.     Defendant Neumann is the co-founder and former Chairman and CEO of WeWork.  Neumann also maintained voting control over the Company through his ownership of Class A, Class B, and Class C WeWork stock and exercised complete control over, and power to replace members of, WeWork's Board of Directors (the "Board").  Neumann prepared, reviewed and was responsible for the statements to investors complained of herein, participated in investor presentations, and provided interviews with the media regarding WeWork and its business as an official spokesperson for the Company.  Neumann was forced out as CEO in September 2019 in connection with WeWork's aborted IPO.

18.     Defendant Arthur Minson ("Minson") served as WeWork's Chief Financial Officer ("CFO") between June 2016 and September 2019 and one of its Co-Presidents between June 2015 and September 2019.  Minson prepared, reviewed and was responsible for the statements to investors complained of herein, participated in investor presentations, and provided interviews with the media regarding WeWork and its business as an official spokesperson for the Company.  Minson replaced defendant Neumann as WeWork's CEO in September 2019, a position he shared with Sebastian Gunningham until the position was taken over by Sandeep Mathrani in February 2020.

19.     Defendant Michael Gross ("Gross") had served as WeWork's Vice Chair since 2015, reporting directly to defendant Neumann until his termination in September 2019.  Prior to that time, he served as WeWork's CFO.  Gross prepared, reviewed and was responsible for the statements to investors complained of herein, participated in investor presentations and provided interviews with the media regarding WeWork and its business as an official spokesperson for the Company.

1      20.     Defendant Lewis Frankfort ("Frankfort") served as a director of WeWork in the

2 lead-up to its failed IPO, a position he had held since July 2014.  Frankfort prepared, reviewed and

3 was responsible for the statements to investors complained of herein during his time as a WeWork

4 director.

5      21.     Defendant Bruce Dunlevie ("Dunlevie") served as a director of WeWork in the

6 lead-up to its failed IPO, a position he had held since July 2012.  Dunlevie prepared, reviewed and

7 was responsible for the statements to investors complained of herein during his time as a WeWork

8 director.

9      22.     Defendant M. Steven Langman ("Langman") served as a director of WeWork in

10 the lead-up to its failed IPO, a position he had held since July 2012.  Langman prepared, reviewed

11 and was responsible for the statements to investors complained of herein during his time as a

12 WeWork director.  Langman resigned his WeWork directorship in February 2020.

13      23.     Defendant John Zhao served as a director of WeWork in the lead-up to its failed

14 IPO, a position he had held since July 2016.  He prepared, reviewed and was responsible for the

15 statements to investors complained of herein during his time as a WeWork director.

16      24.     Defendant Mark Schwartz ("Schwartz") served as a director of WeWork in the

17 lead-up to its failed IPO, a position he had held since March 2017.  Defendant Schwartz also

18 formerly served as an outside director of defendant Softbank Group Corp. ("Softbank") and was

19 one of its director appointees to the Board.  As such, on behalf of defendant Softbank and himself,

20 defendant Schwartz prepared, reviewed and was responsible for the statements to investors

21 complained of herein during his time as a WeWork director.  Schwartz resigned his WeWork

22 directorship in February 2020.

23      25.     Defendant Ronald D. Fisher ("Fisher") served as a director of WeWork in the lead-

24 up to its failed IPO, a position he had held since November 2017.  Defendant Fisher also served

25 as a director and executive of defendant Softbank and was one of its director appointees to the

26 Board.  As such, on behalf of defendant Softbank and himself, defendant Fisher prepared, reviewed

27 and was responsible for the statements to investors complained of herein during his time as a

28 WeWork director.  Fisher resigned his WeWork directorship in February 2020.

26. The defendants listed in ¶¶17-25 are collectively referred to herein as the Individual Defendants. As officers, directors and/or controlling persons of WeWork, the Individual Defendants disseminated statements to investors with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and business prospects, which statements were made for the purpose of inducing the purchase of WeWork securities. The Individual Defendants participated in the drafting, preparation, and/or approval of the various shareholder and investor reports, offering circulars, presentations, and other communications complained of herein. Through their positions, each of the Individual Defendants had access to and knew of the adverse undisclosed information about the Company's financial condition and performance detailed herein. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various releases, investor presentations, and other statements pertaining to WeWork during the Class Period. During their tenure with the Company, each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Each of the Individual Defendants willfully participated in the issuance of statements to investors that they knew contained misleading statements of fact, as detailed herein, for the specific purpose of inducing the purchase of WeWork securities. Accordingly, each of the Individual Defendants is responsible for the accuracy of the statements to investors regarding WeWork detailed herein and is therefore liable for the misrepresentations contained therein.

27. Defendant Softbank Group Corp. ("Softbank") was an early investor in WeWork. Through various affiliates, defendant Softbank entered into shareholder agreements with the Company that provided it with control and influence over WeWork. Through this control and its financial entanglements with the Company, defendant Softbank ensured that its director nominees, defendants Schwartz and Fisher, were appointed to the WeWork Board. As WeWork has stated in recently filed litigation, "each" of these "hand-picked directors and management team . . . was

1  recruited by and is beholden to Softbank, to pursue Softbank's favored business plan for the

2  Company."

3       28.    Defendant Softbank became one of the Company's primary promoters, with its

4  CEO Masayoshi Son working directly and indirectly with defendant Neumann to help craft the

5  Company's business strategy, and helped WeWork raise millions of dollars in private capital.[1]

6  Softbank pushed for the Company to conduct an IPO pursuant to the highly misleading growth

7  story detailed herein, with the goal of allowing Softbank to sell its own WeWork securities at

8  inflated prices.    As acknowledged by WeWork, defendant Softbank "possessed extensive

9  knowledge of the Company's financial condition," as well as "complete knowledge of the facts

10  underlying the investigations" by numerous government agencies into misconduct at the Company

11  during the Class Period, including the misrepresentations to WeWork investors detailed herein.

12  Defendant Softbank and its Board appointees in their role as Softbank representatives willfully

13  participated in the issuance of misleading statements to investors detailed herein for the purpose

14  of inducing the purchase of WeWork securities.    Accordingly, defendant Softbank controlled

15  WeWork during the Class Period and is responsible for the accuracy of the statements to investors

16  regarding WeWork detailed herein and is therefore liable for the misrepresentations contained

17  therein.

18       29.    Each of the defendants is liable for making false or misleading statements, aiding

19  and abetting one another, and/or willfully participating in acts that damaged Class members in

20  violation of California law.    In committing the wrongful acts alleged herein, each defendant

21  willfully participated in acts and transactions and/or aided and abetted such unlawful acts and

22  transactions, which inflated the price of WeWork securities, deceived the investing public, and

23  permitted defendants to sell hundreds of millions of dollars' worth of WeWork securities at

24  artificially inflated prices.

25

26  _____

[1]    As WeWork recently noted in litigation filings, "SoftBank was far from blameless in the

27  Company's failed IPO and subsequent financial challenges.    As SoftBank deepened its investment
in the Company, it pressed for the Company to grow at all costs while the controversial and highly-

28  publicized behavior of Neumann remained unchecked."

**FACTUAL ALLEGATIONS**

**The Rise of WeWork**

30.     WeWork is a real estate and workspace sharing company.  Founded in 2010 by defendant Neumann, his wife Rebekah Neumann, and Miguel McKelvey, the Company opened its first facility in New York City, offering shared workspace and services to entrepreneurs, freelancers, startups, and small businesses.  The Company distinguished itself by its focus on developing perk-filled shared workspaces intended to foster a sense of collaboration and community.

31.     Defendant Neumann became the public face of the Company.  He led with striking personal charisma, engendering admiration both within and outside the Company for his apparent entrepreneurial vision.  He was prone to opining on grand ideas like ending world hunger or figuring out ways to "solve the problem of children without parents."  He led lavish "summer camps" in which thousands of WeWork employees gathered in an annual music-festival-like atmosphere and engaged in activities meant to foster mindfulness, camaraderie and progressive ideals while being entertained by popular musicians like Bastille and Alesso.  As defendant Neumann boldly proclaimed, "We are here in order to change the world.  Nothing less than that interests me."

32.     WeWork grew quickly.  By 2012, the Company had four locations in New York City as well as facilities in Los Angeles and San Francisco.  In 2014, WeWork opened two co-working facilities in Washington, D.C. and another in Seattle and its first international location in London.  By the end of 2015, WeWork had 54 coworking facilities in New York City, Boston, Philadelphia, Washington, D.C., Miami, Chicago, Austin, Berkeley, San Francisco, Los Angeles, Portland and Seattle.  The Company's international locations also expanded to Tel Aviv and Herzliya in Israel.

33.     In 2017, WeWork opened a 2,200 seat community workspace in Bangalore, India, and debuted in Tokyo with 20 work facilities.  Since then, the Company has continued to expand its real estate footprint at a rapid rate, as illustrated below:

1
2
3
4
5
6
7
8



drift.com/blog/wework-billion-dollar-growth/

9
10        34.    In addition to expanding in size, the mission of WeWork and its ambitious CEO

11   broadened in scope.  Defendant Neumann had long claimed that WeWork should be viewed more

12   as a tech startup that would revolutionize all aspects of life by connecting people and fostering a

13   shared sense of purpose.  He emphasized WeWork's data capabilities, empowering innovative

14   product development that increased members' productivity, happiness and success and offered a

15   model that could be applied to various human endeavors.

16        35.    Towards this end, WeWork rapidly expanded into other industries, such as

17   education, fitness, consumer products, and residential housing, ultimately acquiring over 20

18   organizations.  A key part of defendants' misconduct was using WeWork stock to acquire these

19   assets.  In fact, WeWork spent more than $500 million in two years buying disparate companies,

20   many acquired using artificially inflated WeWork securities.  These diverse holdings helped the

21   Company pitch to investors that it was far more than a traditional real estate company.  Instead,

22   WeWork purported to rewire physical social interaction and thus claimed to be comparable to

23   other transformative tech startups.  In January 2019, the Company officially changed its name to

24   "The We Company" to reflect its expansive portfolio of community-centered products and

25   services.

26        36.    As WeWork expanded, defendant Neumann and other WeWork executives

27   misrepresented that Company-wide profitability was just around the corner.  For example, a 2014

28   presentation for investors projected the Company would turn a $4.2 million operating profit for

1   the year.  A slide with the headline "Proven, profitable business model" claimed that "WeWork

2   locations operate . . . with average margins of greater than 40%."  Similarly, WeWork provided

3   information to widely circulated publications to demonstrate that purported profitability of the

4   Company's core business.  A 2014 *Forbes* article, citing information provided by defendant

5   Neumann, stated that: "By February 2010, just one month after launch WeWork turned its first

6   profit and has never stopped."  When the Company discussed its mounting losses, defendants

7   reassured investors that these losses were all part of the plan, that the Company was consciously

8   investing in growth, and that its core business remained profitable and would grow even more

9   profitable as locations matured and WeWork reached economies of scale.  As WeWork's footprint

10  grew, so did its need for capital, with the Company raising billions of dollars in private capital in

11  a series of at least 10 funding rounds over the last several years.

12      37.    With the active involvement of defendant Softbank, the private valuation for

13  WeWork almost tripled from about $16 billion in 2016 to $47 billion by January 2019, during

14  which time WeWork raised over $1 billion at inflated prices.  In addition to outside equity

15  investors, WeWork sold millions of dollars' worth of additional shares to its own employees at

16  these sky-high valuations, as well as $700 million worth of debt securities to investors in April

17  2018.

18      38.    By May 2019, WeWork had the highest valuation of any startup in the United

19  States, ahead of Juul, SpaceX and Airbnb.  As *Business Insider* reported on May 29, 2019:

20          With major companies like Uber, Lyft and Pinterest going public, there's a
            new cast of major tech startups that have taken the top spots of most highly valued
21          private   companies,   PitchBook   reports.     But   recent   major   investments   into
            burgeoning tech startups – including Juul and Pokémon Go-creator Niantic – have
22          brought new players into the spotlight.  At this point, there are almost too many
            billion-dollar startups to count.
23
24          ***The We Company's $47 billion valuation solidifies the company's spot at
            the top***.[2]

25

26

27

    ──────────────
28  [2]    Emphasis has been added unless otherwise noted.

**Defendants' False and Misleading Class Period Statements**

39.     Throughout the Class Period, defendants made statements about WeWork's business, finances, operations, and prospects for the purpose of inducing others to invest in the Company.  Defendants portrayed WeWork as a fast-growing tech startup in the mold of Netflix and Amazon that had revolutionized work spaces through innovation, data-driven adaptive business strategies, and a focus on the greater good.  Defendants claimed that this transformative business could be, and in fact was already being, applied to a host of interconnected business lines that would transform the way consumers lived, learned, worked, socialized, and enjoyed leisure activities.  Defendant Neumann dubbed WeWork's myriad businesses a "physical social network," in a nod to the social networking site Facebook, and its customers the "We Generation," representing a global community of innovators.

40.     Defendants also emphasized impressive profitability metrics as proof that the Company's business model was sound, claiming the profitability of the Company's core operations was growing and that mature locations were garnering a healthy operating margin.  They reassured investors that escalating expenses were due to strategic investments that would allow the Company to maintain its breakneck growth and lay the foundation for strong long-term profitability and market dominance.  Indeed, defendants claimed that WeWork could pivot to profitability whenever it decided to exit its current growth mode.  They represented that WeWork's growth rate was sustainable and that the Company was well positioned, with billions of dollars in cash on hand, to continue to scale and achieve its business objectives and weather any market downturn.

41.     These, and similar statements, were false and misleading when made.  Behind its New Age facade and tech trappings, WeWork was at its core just another commercial real estate business, albeit one with a fundamentally flawed, unprofitable business model.  Its growth was not sustainable without the continuous influx of billions of dollars of investor capital.  WeWork's costs exceeded revenues by almost 100% for much of the Class Period and, unbeknownst to investors, were set to rapidly increase at an accelerating rate.  WeWork was hemorrhaging cash not simply due to strategic investments calculated to achieve synergies, economies of scale, and other business objectives as represented to investors, but because WeWork was spending hundreds of millions of

dollars to serve the caprice and personal ambitions of defendant Neumann and his associates, finance the Neumanns' decadent lifestyle, and chase the breakneck growth the Company had used to justify its lofty valuations. Even as profitability fell ever further out of reach, defendants claimed that profitability was actually improving and created vanity metrics, such as "community-adjusted EBITDA," which they knew were false and misleading and concealed the Company's true costs and revenue outlays.

42. Defendants' Class Period misrepresentations were deliberately published to investors in order to amplify defendants' solicitation efforts, and included:

- WeWork financials and investor solicitation materials provided to potential investors at the time and in connection with a July 2017 Series G funding round;

- WeWork financials and investor solicitation materials provided to investors in connection with the Company's April 2018 bond offering;

- Quarterly financial information and business updates to prospective investors following the April 2018 bond offering, including in August 2018, November 2018, March 2019, May 2019 and August 2019;

- Quarterly calls for investors, prospective investors, securities analysts, and market-making financial institutions to discuss the Company's financial results on August 9, 2018, November 13, 2018, March 26, 2019, May 15, 2019, and August 26, 2019;

- WeWork investor presentation and solicitation materials provided to media organizations and widely disseminated and reported on at the time of their issuance;

- Interviews by several Individual Defendants with media organizations in order to bolster, confirm and elaborate on defendants' representations to investors regarding WeWork, as detailed in ¶¶44-89 below; and

- Regularly updated financial, business and operational information regarding WeWork made available to Company investors at the time of their purchase during the Class Period via an online portal maintained by WeWork.

43. Throughout the Class Period, defendants continuously solicited investment in WeWork securities, including hundreds of millions of dollars in private equity funding, a $700 million bond offering in April 2018 and the sale of WeWork securities to employees, as well as to

1   secure additional credit and financing arrangements to support WeWork's operations and to

2   condition the market for the Company's planned IPO.

3   **Defendants' Misrepresentations Regarding WeWork's Growth Metrics**

4          44.   At the core of defendants' pitch to investors was WeWork's phenomenal growth.

5   From its start in 2010, WeWork grew to over 528 locations in 111 cities across 29 countries by

6   2019.  Defendants claimed that WeWork membership had grown by over 100% every year since

7   2014.  By the end of 2016, WeWork boasted roughly 87,000 memberships.  A year later that

8   number had more than doubled to 186,000 memberships, and then doubled again by the end of

9   2018 to 401,000 memberships.  Defendants claimed WeWork had boosted its workstation capacity

10  along a similar trajectory, more than quadrupling the number of desks in two years, from 107,000

11  workstations at the end of 2016 to 466,000 by the end of 2018.  Defendants represented that

12  WeWork's revenues had quickly risen in tandem, growing by 103% to over $886 million in 2017,

13  from $436 million the previous year.  This figure more than doubled again to $1.8 billion by

14  December 31, 2018.

15         45.   Defendants repeatedly emphasized the durability of WeWork's growth.   For

16  example, in an interview with *Axios* published on March 25, 2019, defendant Gross emphasized

17  that WeWork had generated a 100% compound annual growth rate ("CAGR") over the preceding

18  eight years.  He continued: "'We have a global membership network that sits on top of this global

19  physical platform that we have the opportunity to further monetize,'" indicating that WeWork had

20  the ability to continue to grow revenues and ultimately profit from its existing customer base.

21  Similarly, in an interview with *Business Insider* published on April 29, 2019, defendant Minson

22  stated that WeWork was "'just getting started'" in its push to grow revenues through enterprise

23  clients.  He claimed that WeWork was "'now opening buildings at a much higher percentage filled

24  than we used to, and that's because you're not building on spec[ulation]; you're building on you

25  know what people want and when they want it.'"   In a January 14, 2019 *CNBC* interview,

26  defendant Neumann likewise represented that WeWork ended 2018 with a $2.5 billion revenue

27  run rate and had already nearly matched that total at the time with $2.4 billion in long-term revenue

28  commitments.

46.    This breakneck growth and the promise of more to come was key to the Company's valuation.   Defendant Neumann rejected comparisons to traditional commercial real estate companies, insisting that WeWork should be valued more like Amazon, Salesforce and Tesla, including during a January 2019 *CNBC* interview and a presentation with Wall Street analysts in July 2019.  Defendants famously touted WeWork's so-called "asset light" model, a claim reiterated in connection with the Company's April 2018 bond offering, representing that the Company's business mirrored that of services companies that had revolutionized the sharing economy such as Uber and Airbnb.

47.    Although the Company's expenses rose, defendants claimed that this too was part of the Company's disciplined growth strategy and that the Company could pivot to profitability whenever it so desired.  For example, at a technology conference held in New York City on May 15, 2017, defendant Neumann claimed that WeWork was achieving 40% margins on its U.S. properties.   When asked whether overall the Company was generating profits, he responded: "[Profitability] is per choice.  Because when you have a 40% margin, you can actually choose when to be profitable.  We like to hover around EBITDA break-even and then we can choose when we want to move, where we want to move.  Right now, we're in a very high growth stage of our business and we don't see that stopping anytime soon."

48.    Likewise, in a presentation to the media regarding WeWork's first quarter 2019 financial results published in *The New York Times* on May 15, 2019, defendant Minson stated that WeWork's losses were due to investments in business that were making money, stating: "'There is a real difference between losing money and investing money.'"  He claimed that WeWork could become profitable if it slowed growth, citing WeWork's growth as proof that the company was funneling cash into productive uses.  He reassured investors, "'We are very clearly investing money in a proven business model.'"

49.    According to defendants, WeWork's profitability would continue to improve as newer locations matured and generated economies of scale and increased efficiencies.  Defendants also emphasized the Company's enterprise clientele, defined as clients with more than 500 employees, and claimed that this group made up an increasingly large proportion of the Company's

1  customer base during the Class Period.  By 2019, defendants claimed that enterprise customers
2  made up more than 40% of WeWork's member and service revenues, having roughly doubled
3  since 2016.  Defendants represented that this larger proportion of enterprise clients provided the
4  Company with recurring revenues and consistent cash flows.

5      50.    As defendants knew, the statements in ¶¶44-49 were false and misleading at the
6  time they were made.  The true facts were as follows:

7          (a)    WeWork's growth rate was fundamentally unsustainable, as it was fueled
8  by reckless expenditures constrained by unfavorable market dynamics and inflated with short-term
9  accounting and operational gimmicks designed to conceal costs and overstate revenues;

10          (b)    WeWork's efforts to maintain its reported annual revenue growth rate had
11  resulted in it entering into increasingly unprofitable and loss-making arrangements with tenants
12  and landlords, including hundreds of millions of dollars' worth of rent concessions, revenue
13  sharing agreements, and other short-term promotional arrangements;

14          (c)    by January 2018, WeWork was expanding into less profitable markets and
15  opportunities for rent arbitrage in its existing markets had diminished as the Company scaled up;

16          (d)    by January 2018, landlords were increasingly refusing to rent to WeWork
17  and/or choosing to directly lease to coworking tenants in order to maximize their own profits;

18          (e)    WeWork's costs were accelerating and poised to accelerate significantly
19  faster than revenues, due to, *inter alia*, profligate spending, the diminishing availability of
20  reasonably priced properties, the loss of rent concessions, and WeWork's lack of core operating
21  profitability;

22          (f)    WeWork had artificially lowered its reported lease costs due to the
23  Company's receipt of short-term rent concessions on new properties (constituting up to 70% of
24  the Company's portfolio) that were set to expire and the Company was entering new markets where
25  rent concessions were not customarily provided;

26          (g)    WeWork reported artificially deflated build-out and design costs, as a
27  material proportion of these purported cost reductions were in fact cost transfers to landlords and
28  enterprise clients in exchange for revenue concessions;

1      (h)    WeWork had been forced to grant tens of millions of dollars in rent

2  concessions and other promotions that lowered the Company's lease revenues in order to attract

3  enterprise clients, negatively impacting WeWork's top line revenues by up to -6%;

4      (i)    WeWork was not operating an "asset light" business model, but rather

5  WeWork operations required the expenditure of hundreds of millions of dollars annually to

6  maintain and repair billions of dollars' worth of furniture, fixtures and equipment held by the

7  Company;

8      (j)    as a result of (a)-(i) above, WeWork's core business was not profitable and

9  its losses were accelerating as the Company grew revenue; and

10     (k)    as a result of (a)-(j) above, WeWork's business model, historical financial

11  results, and future prospects were materially worse than represented to investors.

12     51.    In fact, behind the scenes, the Company's real estate team and sales force were

13  struggling to keep up with ever rising – and increasingly unrealistic – growth targets.  During the

14  Class Period, the Company repeatedly raised internal sales projections, even as the costs of

15  incremental growth skyrocketed, diminishing the Company's future prospects and leading to

16  accelerating losses.  Defendant Neumann was determined to be able to represent to investors that

17  WeWork was achieving annual growth above 100% no matter the cost.  As would later be reported,

18  in late 2018, defendant Softbank offered WeWork executives the ability to increase their share of

19  the Company from 37% to 51% if WeWork grew annual revenue from $2 billion in 2018 to $50

20  billion five years later.  Although the deal, dubbed "Project Fortitude," was never consummated,

21  defendant Neumann told his team in the midst of negotiations that they should exceed these targets

22  and maintain WeWork's 100% annual revenue CAGR.

23     52.    According to the *Financial Times*, as one unnamed executive would later concede,

24  WeWork was "'burning more money than we otherwise expected to spend'" to meet its financial

25  targets in 2018 and 2019.  According to another employee, "'There was enormous pressure . . . .

26  People were having nervous breakdowns trying to sign new space.  We were always aggressive,

27  but we became ridiculously aggressive.'"  In a November 2019 interview, one market participant

28  summed up the reckless business tactics he had witnessed: "'We have lost deals to customers in

1    the last 12 to 18 months where they were paying less than WeWork was paying for the real estate

2    itself . . . .  That doesn't make sense.'"

3        53.     As a result, rather than increasing profitability and generating efficiencies as

4    defendants represented, the Company was losing money at an accelerating rate and had set the

5    stage for even greater losses ahead.  Despite the Company's rapid revenue growth, its expenses

6    were climbing significantly faster.  This led to ballooning losses, as WeWork's costs were roughly

7    double revenues for much of the Class Period.  The Company's expenses totaled $832 million in

8    2016.  By 2018, this number had climbed to an eye-watering $3.5 billion, a 322% increase in just

9    two years.  During the same time period, the Company's net losses jumped 349% from $430

10   million in 2016 to more than $1.9 billion in 2018.  Notwithstanding defendants' statements to the

11   contrary, this dynamic continued to worsen during the Class Period.  For the third quarter of 2019,

12   WeWork lost a staggering $1.25 billion on $934 million in revenue.  Although revenue grew 94%

13   year-over-year, net losses far outpaced revenue growth at an astonishing *151%* year-over-year

14   growth rate, far higher than in previous quarters.  As Nori Lietz, a Harvard Business School

15   lecturer on real estate and venture capital, noted: "Something is wrong" at WeWork.  "They're not

16   managing their growth – they're spending money like drunken sailors."

17       54.     While defendants had claimed that WeWork's losses represented controlled growth

18   and strategic investment spending that would lay the foundation for profitability, the exact opposite

19   was true.  As would later be revealed, WeWork was engaged in profligate spending in a reckless

20   bid for growth at all costs – not in a manner designed to sustainably grow its business, but rather

21   to induce capital raises from investors at ever higher valuations.  The Company has since admitted

22   as much.  In an October 2019 slide presentation, after shocking details emerged of the Company's

23   behind-the-scenes excess in the course of its failed IPO bid, WeWork acknowledged it had

24   eschewed a disciplined focus on profitable market expansion and instead strove to "[g]row

25   business commitments prior to funding commitments."  In other words, WeWork expanded its

26   business empire not because it made business sense, but for the primary purpose of inducing

27   additional investment in the Company.

28

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE          - 18 -

55.     WeWork was also saddled with billions of dollars' worth of physical assets it needed to maintain.  The claimed "asset light" business model was a ruse.  As of December 31, 2017, WeWork held $2.6 billion in property and equipment on its book.  A year later, this amount had increased to $4.9 billion.  By June 30, 2019, it had grown to $7.5 billion.  Much of this staggering increase simply constituted profligate spending.  The Company ordered lavish furniture, like $9,400 Børge Mogensen designed chairs.  Struggling to meet aggressive growth targets and open multiple buildings a week, staffers often shipped couches by air to arrive on time, which sometimes cost more than the couches themselves.  Employees were whipsawed by frequent design changes, causing them to trash furniture that was only months old or sell expensive furniture suddenly deemed outmoded at fire-sale prices.

56.     In order to conceal the ongoing impact of maintaining and replacing these items on the Company's bottom line, defendants simply excluded them from profitability metrics provided to investors.  But ignoring hundreds of millions of dollars' worth of necessary and known expenditures did not make those expenditures disappear.  As of December 31, 2018, accumulated depreciation of WeWork property and equipment totaled more than $571 million.  Six months later it totaled more than $804 million.  Repair and replacement costs required to maintain the Company's coworking spaces continued to accelerate, as the Company later revealed a staggering $7.5 billion in property and equipment as of June 30, 2019.

57.     The Company's rush to boost short-term metrics that could be pitched to investors no matter the long-term consequences manifested in other ways as well.  For example, throughout the Class Period, WeWork became increasingly reliant on revenue-sharing agreements with landlords in order to fund lower build-out and design costs.  Landlords agreed to cover a portion of the costs in exchange for a portion of WeWork's profits.  This enabled defendants to claim lower upfront costs in discussions with investors, but also limited the revenues that the Company expected to receive over the lease term.  While defendants included these cost savings in the WeWork profitability metrics provided to investors, they omitted from these emphasized profitability metrics the expected impact of reduced revenues from such agreements over the lease term.  As much as one third of total capital expenditures in 2018 and the first six months of 2019

1  involved such revenue sharing arrangements, dramatically limiting the Company's revenue growth

2  potential. On the other side of the ledger, defendants represented to investors that WeWork had

3  reduced by 50% its net capital expenditures per desk added, claiming this demonstrated the

4  Company had achieved economies of scale and increased efficiencies. However, a substantial

5  portion of this so-called cost "reduction" in fact represented cost sharing with landlords who

6  agreed to take on building costs in exchange for a portion of the Company's future revenue

7  opportunities.

8        58. Ballooning costs, eroded revenue potential, and a more limited market opportunity

9  meant that WeWork was nowhere near the path to profitability represented to investors, but rather

10  it was poised to suffer ever widening deficits. This unfortunate fact has been borne out in the

11  Company's financial results. By October 2019, following the third quarter of 2019, during which

12  WeWork lost $1.25 billion on $934 million in revenue, the Company was on the brink of running

13  out of cash completely when it was bailed out by defendant Softbank. In the fourth quarter of

14  2019, WeWork signed just four new leases in the United States, *a 93% decline* compared to the

15  prior four quarters. The Company was forced to effectively halt all expansion efforts, radically

16  curtail costs, lay off thousands of employees, and sell substantially all of its ill-conceived

17  acquisitions. The Company's vaunted growth rate was a mirage.

18        59. Following its failed IPO attempt, WeWork stated that it was returning to its "core"

19  business of leasing coworking spaces. Stripped of its purportedly transformative trappings and its

20  vaunted growth metrics, which have now been exposed as highly misleading and unsustainable,

21  WeWork has been revealed to be what it actually is – a property management company, not a tech

22  startup. Applying the enterprise value and earnings multiples of these comparators to WeWork's

23  business derives a value of only $2 to $4 billion, a fraction of the $47 billion valuation peddled to

24  investors.

25  **Defendants' Misrepresentations Regarding WeWork's Profitability**

26        60. Defendants strove to present WeWork's business as highly profitable even as it

27  sustained significant losses. For example, during a May 15, 2017 presentation at a technology

28  conference, defendant Neumann claimed that WeWork was generating 40% margins on its U.S.

1  properties.  When asked whether overall the Company was generating profits, he responded:

2  "[Profitability] is per choice.  Because when you have a 40% margin, you can actually choose

3  when to be profitable.  We like to hover around EBITDA break-even and then we can choose when

4  we want to move, where we want to move.  Right now, we're in a very high growth stage of our

5  business and we don't see that stopping anytime soon."  Defendant Minson echoed this sentiment

6  in an interview with *The New York Times* published on March 25, 2019: "'We can very much, if

7  we chose to, moderate our growth and become profitable . . . .  But it's a time for us to continue to

8  accelerate.'"

9          61.     As the Company moved into new markets, including internationally, with lower

10  profit potentials, defendants still claimed that WeWork offices generated far more money than

11  they cost to run in investor solicitation materials, with 30% margins expected across the

12  Company's portfolio at stable locations.  Throughout the Class Period, defendants also represented

13  that WeWork's core profitability was improving as a percentage of service and membership

14  revenues – from 22% in 2016, to 27% in 2017, to 28% in 2018 – as the Company continued to

15  scale and improve operational efficiencies.  For example, defendants represented that WeWork

16  had reduced by 50% its net capital expenditures per desk added between 2014 and the first half of

17  2019.  Defendants claimed that these savings allowed WeWork to save its tenants up to 60% in

18  rental costs versus standard lease terms.

19          62.     During the Class Period, defendants stated that WeWork facilities were breakeven

20  when operating at 60% occupancy.  This representation was made by defendants in, *inter alia*,

21  solicitation materials for WeWork's April 2018 bond offering.  Importantly, defendants

22  consistently represented that WeWork properties had already cleared this hurdle and that, as a

23  result, profitability would improve as locations matured.  For example, defendants claimed that

24  the Company had filled 81% of desks in 2017, up 5% over 2016, and that this number continued

25  to climb in 2018.  Defendants also claimed that the higher occupancy rate during this period was

26  owing in part to WeWork's successful attraction of large enterprise customers.  Defendants stated

27  that enterprise members comprised 18% of WeWork's total membership as of year-end 2016.  This

28  number purportedly increased to 28% by year-end 2017 and to 38% by year-end 2018.  Defendants

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE                    - 21 -

1   claimed that this increase in enterprise members had provided more stable revenues and recurring

2   cash flows.  Defendants reported on these and other similar operational metrics during quarterly

3   earnings and investor presentations, including, *inter alia*, during those held in April 2018, August

4   2018, November 2018, March 2019 and May 2019 described in ¶42 above.  As defendant Minson

5   stated in an interview with *Business Insider* published on April 29, 2019: "'We're really just

6   getting started on enterprise . . . .  We're now opening buildings at a much higher percentage filled

7   than we used to, and that's because you're not building on spec[ulation]; you're building on you

8   know what people want and when they want it.'"

9          63.     During the Class Period, defendants also focused attention on a profitability metric

10  that WeWork had created, known as "community-adjusted EBITDA."  For example, this

11  profitability calculation was a focus of defendants' solicitation of investors in connection with

12  WeWork's April 2018 bond offering and during subsequent quarterly financial presentations with

13  investors and analysts.  This measure subtracted not only interest, taxes, depreciation and

14  amortization, but also basic expenses like marketing, general and administrative, and development

15  and design costs.  Defendants asserted the use of community-adjusted EBITDA presented a more

16  accurate picture of the Company's core profitability, stripping out the cost of various growth

17  initiatives that they claimed could be scaled back at any time.  By this measure, defendants

18  represented that WeWork generated $233 million in profits in 2017, resulting in an impressive

19  profitability margin of 27% on existing properties, with the Company's 30% expected margin at

20  mature properties intact.  This was more than double the $96 million in profits that defendants

21  claimed WeWork had generated in 2016.  Defendants claimed WeWork's core profitability

22  continued to increase during the Class Period, as it achieved $467 million in community-adjusted

23  EBITDA in 2018, up more than 100% year-over-year.[3]  Margins, too, were presented as being on

24  an upward trajectory, as WeWork's community-adjusted EBITDA margin increased from 22% in

25  2016, to 27% in 2017, to 28% in 2018.

26

27  [3]   "Community-adjusted EBITDA" was rejected by the SEC as a misleading metric in the course
    of the Company seeking a public listing.  However, in SEC filings it appears that the measure was

28  renamed "[c]ontribution [m]argin excluding non-cash GAAP straight-line lease cost."

1   64.   Defendants provided a number of additional tailor-made profitability metrics to

2   investors.  For example, defendants claimed that WeWork generated 2017 "location contribution"

3   of $494 million, which purportedly measured the revenues generated by memberships minus

4   certain costs and adjustments, and that this represented a greater than 100% increase as compared

5   to 2016.  Defendants also stated that WeWork's location revenue contribution per desk had

6   increased from $2,285 in 2016 to $2,373 in 2017, again indicating an overall increase in core

7   profitability.

8   65.   As measured by another metric, "average revenue per physical member," or

9   "ARPPM," defendants stated that WeWork generated $6,928 in revenues per member in 2017.

10  This compared to net annual capex of $5,631 for each new desk added, again purportedly

11  demonstrating the Company's core profitability.  Defendants calculated ARPPM by dividing

12  membership and service revenues by the average number of WeWork memberships on the first

13  day of the reported month.  While the Company's ARPPM had decreased over time, defendants

14  claimed this was due to WeWork's expansion into less expensive markets like Mexico City.

15  However, defendants represented that on a constant city basis, WeWork was actually taking in

16  more revenue per head at the same time that the Company's net capex per desk added was

17  decreasing at an even faster rate.  For example, defendant Minson repeated these representations

18  in an interview with *Recode* published on August 9, 2018.

19  66.   As defendants knew, the statements in ¶¶60-65 were false and misleading at the

20  time they were made.  The true facts were as follows:

21  (a)   the purported operational profitability metrics provided to WeWork

22  investors – including, *inter alia*, community-adjusted EBITDA, location contribution margin and

23  ARPPM – did not reflect the Company's operational profitability and were misleading, as they

24  excluded hundreds of millions of dollars' worth of necessary operational costs, had been inflated

25  with short-term accounting and operational gimmicks designed to conceal costs and overstate

26  revenue, and failed to account for the increased costs and diminished profit opportunities that the

27  Company was then experiencing;

28

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE          - 23

1          (b)     WeWork's efforts to maintain its reported annual revenue growth rate

2  during the Class Period had required it to enter into increasingly unprofitable and loss-inducing

3  arrangements with tenants and landlords, including hundreds of millions of dollars' worth of rent

4  concessions, revenue sharing agreements, and other short-term promotional arrangements;

5          (c)     by January 2018, WeWork was expanding into less profitable markets and

6  opportunities for rent arbitrage in its existing markets had diminished as the Company scaled;

7          (d)     WeWork's costs were accelerating and poised to accelerate significantly

8  faster than revenues, due to, *inter alia*, profligate spending, the diminishing availability of

9  reasonably priced properties, the loss of rent concessions, lack of core operating profitability;

10        (e)     WeWork had artificially lowered its reported lease costs due to the

11  Company's receipt of short-term rent concessions on new properties (constituting up to 70% of

12  the  Company's portfolio) that were set to expire and the Company was entering new markets

13  where the provision of rent concessions was not customarily provided;

14        (f)     WeWork reported artificially deflated build-out and design costs, as a

15  material proportion of these purported cost reductions were in fact cost transfers to landlords and

16  enterprise clients in exchange for revenue concessions;

17        (g)     WeWork's profitability calculations excluded hundreds of millions of

18  dollars' worth of annual costs to maintain, repair and replace furniture, fixtures and equipment

19  necessary to the Company's operations;

20        (h)     WeWork had been forced to grant tens of millions of dollars in rent

21  concessions and other promotions that lowered the Company's lease revenues in order to attract

22  enterprise clients, negatively impacting WeWork's top line revenues by up to -6%;

23        (i)     WeWork's profitability calculations excluded tens of millions of dollars in

24  general and administrative expenses necessary to the operation of the Company's locations;

25        (j)     rather than operating at a 25% to 40% margin as represented, WeWork was

26  in fact operating at a margin of approximately **negative** 40%;

27        (k)     WeWork locations were not breakeven at 60% occupancy;

28

1        (l)     as a result of (a)-(k) above, WeWork's core business was not profitable and

2 its losses were accelerating as the Company grew revenue; and

3        (m)   as a result of (a)-(l) above, WeWork's business model, historical financial

4 results, and future prospects were materially worse than represented to investors.

5        67.     Defendants' profitability claims were false and misleading and ultimately

6 disintegrated in the course of WeWork's aborted IPO, as the SEC rejected many of defendants'

7 creative accounting tricks as misleading.  In fact, the SEC reportedly had still not signed off on the

8 Company's characterizations of its profitability at the time its IPO was withdrawn in September

9 2019.

10       68.     As WeWork was forced to make additional disclosures regarding its business and

11 operating metrics in the course of its failed IPO attempt, the profitability claims that defendants

12 had previously provided to investors faced withering scrutiny.  To take one notable example, in

13 September 2019, Harvard Business School lecturer Nori Lietz published a detailed analysis of

14 WeWork's profitability representations in its SEC filings for the IPO.  Notably, these metrics were

15 the product of more than eight months of wrangling with the SEC over the Company's disclosures

16 and shone more light on WeWork's business and financials than had previously been shared with

17 investors.  Lietz concluded in her analysis:

> In short, WeWork took advantage of the JOBS Act to present their
> financials in such a way that, in aggregate, could be considered misleading. In
> general, they presented the most favorable outcomes, without providing
> counterbalancing offsets to revenues and expenses.
>
> For example, WeWork never presented a GAAP-compliant EBIDTA line
> anywhere in the prospectus, which is a very basic metric. Instead, they proposed a
> new metric, "contribution margin", as the basis of how to analyze their unit
> economics. This metric incorporates the benefit of free rent and other concessions
> they receive from landlords on the front-end without disclosing the future costs the
> company will incur when these concessions burn off.
>
> Among several items detailed in my analysis, WeWork failed to include
> major expenses in their current operations that could materially impact their
> contribution margin, such as the failure to record any reserves for their furniture,
> fixtures, and equipment that are very real current costs. They fail to allocate any of
> their corporate G&A to their open, operating facilities. GAAP would require them
> to allocate all of it in an EBIDTA calculation. If these items are included,
> WeWork's contribution margin becomes substantially negative. Ultimately, the
> metric WeWork proposes to use is of marginal utility in analyzing the company's
> results.

Missing Information

The prospectus fails to give guidance to potential investors in other areas. WeWork fails to discuss the impact of the free rent and other concessions it has to *give* to its enterprise tenants as an offset to the concessions they have received from landlords. Further, there is no discussion of the potential impact of the revenue sharing arrangements WeWork provides landlords in exchange for the latter's willingness to provide the capital for the buildout and tenant improvements at their facilities. Both factors will have an impact on their top line revenues. WeWork also fails to address how they will get their G&A growth under control to some reasonable level. G&A is growing at a rate that exceeds their topline revenue growth.

(Emphasis in original.)

69.    The misrepresentations and omissions analyzed by Lietz were material. For example, "community-adjusted EBITDA" allowed defendants to claim WeWork achieved a profit of $233 million in 2017 – a year in which the Company actually suffered a $933 million net loss. Lietz explained how some of this financial wizardry worked. According to her analysis, WeWork backed out the impact of free rent and other landlord concessions in its profitability metrics instead of amortizing them over the lease term. This allowed the Company to represent that it had lowered costs on newer locations, even though costs would rise as the concessions wore off, normally after one year. The impact of this financial engineering was particularly potent because of the Company's rapid growth, which meant that a relatively high proportion of its leases still benefited from temporary concessions during the Class Period. The Company's costs per location were expected by defendants to significantly increase subsequent to the first half of 2019 as leases reverted to the contracted rate, a problem compounded by the fact that the Company's planned expansion was into markets where landlord concessions were not the norm.

70.    This omission was all the more misleading because, while WeWork included the benefit of concessions received from landlords in reducing its upfront costs, it failed to break out the concessions it gave to its tenants. The significance of omitting the impact of tenant concessions became even more pronounced as WeWork signed up an ever-greater proportion of enterprise members, because these tenants had sufficient bargaining power to extract significant concessions from the Company. According to Lietz, by June 2019, roughly 15% of WeWork's top-line revenues were due to concessions from landlords. Assuming that WeWork granted its enterprise

members (which made up about 40% of its overall membership by 2019) concessions at the same rate, total tenant concessions constituted roughly 6% of the Company's total revenue.  WeWork failed to provide this material information to investors as part of its touted profitability metrics, as well as the accounting treatment of such concessions.  The Company's revenue and profitability were adversely impacted by WeWork's provision of  increasingly greater concessions in order to induce new client signups, which had adversely impacted the Company and contributed to a 21% decline in revenue per membership between 2017 and June 30, 2019.

71.     Defendants also omitted important costs from WeWork's profitability metrics.  For example, defendants failed to include the impact of general and administrative ("G&A") expenses, despite the fact that a significant portion of this overhead was necessary to the operation of the Company's locations.  Corporate G&A grew far faster than the Company's revenues and more than other types of costs during the Class Period, growing 151% between June 2018 and June 2019 to over $570 million.  This represented approximately a five-fold increase over 2016.  By comparison, top-line revenues increased by only 101% during this time.  Defendants failed to provide an accurate measure of WeWork's profitability, which required allocating the proportion of G&A expenses necessary to maintain and operate its locations.  Lietz estimated that the Company's G&A costs per workstation needed to decrease by 74% in order for the Company to breakeven on its location operations.

72.     Similarly, even though WeWork's carefully crafted profitability calculations purportedly demonstrated core operational profits, they omitted maintenance and replacement costs for furniture and equipment necessary to the operation of WeWork properties.  Instead, WeWork treated these expenditures as capital items, notwithstanding the fact that these costs constituted ongoing operating expenses.  Wear and tear in the Company's communal spaces cost it hundreds of millions of dollars annually, and WeWork's furniture and equipment were in constant need of being repaired or replaced.  As of December 31, 2018, accumulated depreciation of WeWork property and equipment totaled more than $571 million.  Six months later this figure had increased to more than $804 million, an amount compounded by the Company's extravagant spending on furnishings such as $9,400 Børge Mogensen designed chairs, the need to ship

1    furniture by air to meet growth deadlines, frequent design changes and excessive item

2    replacements, and WeWork's short-term focus on quickly furnishing a rapidly expanding real

3    estate portfolio no matter the cost.

4          73.    Adjusting for G&A expenses, furniture and equipment depreciation and

5    amortization expenses, and other relevant factors, Lietz estimated that WeWork's locations were

6    operating at a ***negative*** 40% margin in the first half of 2019.  She concluded: "To suggest that

7    WeWork's Contribution Margin target is 30% and the 25% figure [for the first half of 2019] above

8    is representative of their performance is misleading."  Although WeWork claimed that its business

9    model provided shared space at lower cost, many of the purported cost reductions were simply

10   cost transfers to WeWork.  Industry analysts have estimated that to operate profitably, the

11   aggregate rent needed to cover the costs for the Company's coworking spaces was roughly double

12   the market rate to cover the increased operational costs and the non-economic space of the

13   community areas.

14         74.    Lietz also took issue with the Company's claims regarding its business model.  She

15   noted that while the Company claimed that it typically saved its tenants over 60% as compared to

16   standard lease terms, in reality this represented a cost transfer rather than a cost savings because

17   WeWork typically bore the brunt of these costs.  Increasingly during the Class Period, WeWork

18   relied on receiving tenant improvement allowances from landlords or enterprise members to

19   reduce upfront build-out and design costs.  However, as discussed above, these allowances were

20   not free, as they required the Company to either enter into a revenue sharing agreement with

21   landlords or provide a rent concession to their enterprise members, both of which impaired a

22   location's revenue potential over the lease term.  While WeWork claimed that it had reduced its

23   net capex per desk by 50%, in truth a substantial portion of these so-called reductions in fact

24   represented a cost transfer to landlords and tenants, with materially adverse consequences for the

25   Company's revenue upside and thus the potential profitability of WeWork locations.

26         75.    An analysis of WeWork's financial results confirms that defendants'

27   misrepresentations that WeWork locations achieved breakeven at about 60% occupancy and that

28   mature and stable WeWork locations enjoyed significant profit margins were false and misleading.

1    Throughout the Class Period, defendants represented that WeWork far exceeded the 60%

2    occupancy threshold, even as its costs per new location fell as it purportedly unlocked efficiencies

3    and economies of scale.  If these representations were true, the gap between top-line revenue

4    growth and the rate of loss would have diminished.  But the opposite occurred, with losses far

5    outpacing revenue growth at an accelerating pace.  In the third quarter of 2019 alone, WeWork's

6    losses ballooned 151% year-over-year to $1.25 billion, while its revenues increased only 94%

7    during this same time period.

8    **Defendants' Misrepresentations Regarding Acquisitions and Insider Dealing**

9         76.    Throughout the Class Period, defendants emphasized the purported altruistic

10   character of WeWork's business and operations.  The Company's mission was to "elevate the

11   world's consciousness."  As stated on the Company's website throughout the Class Period,

12   WeWork was a "place you join as an individual, 'me', but where you become part of a greater

13   'we.'"  Defendant Neumann similarly proclaimed in promotional web videos for the Company

14   that, "If you're not driven just by material goods, you are part of the We Generation."

15        77.    This purported effort to promote collective benefits in all aspects of life was

16   epitomized by the Company's name change to the "We Company" in January 2019.  At the time,

17   defendant Neumann stated that the change reflected the Company's expansion into other business

18   lines in order "to encompass all aspects of people's lives, in both physical and digital worlds."

19   WeWork acquired over 20 organizations in a variety of industries, purportedly all connected by

20   offering community-centered products and services that furthered the WeWork mission.  The

21   Company spent more than $500 million in two years buying disparate companies, many acquired

22   using artificially inflated WeWork stock.  As a result of WeWork's acquisitions, defendants

23   claimed that WeWork had accumulated $681 million in goodwill by December 31, 2018,

24   compared to only $5 million two years previously.  Defendant Neumann represented in an

25   interview with *Wired* published on June 6, 2018 that all of WeWork's acquisitions supported its

26   core business, because "[t]hey're all community driven, and they're all attached to the physical

27   world."  These diverse holdings helped the Company pitch to investors that it was far more than a

28   traditional real estate company and involved in reordering all aspects of its customers' physical

1   social interactions.  As defendant Neumann claimed in a January 14, 2019 interview with *CNBC*

2   promoting the Company, "I am not a seller [of WeWork stock]."

3          78.     As defendants knew, the statements in ¶¶76-77 were false and misleading at the

4   time they were made.  The true facts were as follows:

5                 (a)     defendants' claims of a beneficent business model were being used to

6   conceal hundreds of millions of dollars' worth of insider self-dealing;

7                 (b)     WeWork routinely employed contractors, real estate agents, and other

8   services provided by the friends and relatives of Company executives, rather than conducting

9   arm's-length negotiations with unrelated vendors;

10                (c)     WeWork had agreed to make tens of millions of dollars' worth of lease

11  payments for buildings owned in whole or in part by Company insiders, including at least four

12  properties owned by defendant Neumann, with total minimum undiscounted payments due under

13  these leases of at least $237 million;

14                (d)     WeWork had engaged in tens of millions of dollars' worth of corporate

15  waste in order to finance the Neumanns' opulent lifestyle, including, *inter alia*, the provision of a

16  $63 million corporate jet, facilitating alcohol and drug abuse, the financing of international non-

17  work-related trips, and the provision of over-the-top executive suite amenities;

18                (e)     WeWork insiders had taken out tens of millions of dollars' worth of low

19  interest loans from the Company;

20                (f)     defendant Neumann had cashed out over $740 million of his own WeWork

21  shares in the form of stock sales and pledges during the Class Period at the same that he was

22  inducing others to invest in the Company;

23                (g)     in January 2019, WeWork had agreed to discretely pay defendant Neumann

24  $5.9 million for the right to use the word "We" in connection with its name change to The We

25  Company;

26                (h)     WeWork had acquired dozens of businesses in industries unrelated, or only

27  tangentially related, to its core operations, not with any legitimate business rationale, but rather to

28  serve the personal interests and caprice of the Neumanns;

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE          - 30 -

1          (i)      basic due diligence had not been performed on businesses WeWork

2    acquired during the Class Period; and

3          (j)      the business lines acquired by WeWork during the Class Period were worth

4    only a fraction of their purported value, if anything at all.

5          79.      Defendants' claims regarding the altruistic mission of WeWork and the utility of

6    its diverse business lines were used to induce ongoing purchases of WeWork securities by Class

7    members.  As would later be revealed, WeWork executives used hundreds of millions of dollars

8    of Company capital to finance lavish lifestyles, enrich family and friends, pursue vanity projects,

9    and line their own pockets.  Rather than a culture of "We," to those who ran WeWork the business

10   was all about "me" and "mine."  Defendant Neumann's insider Class B and Class C shares gave

11   him voting control over the Company, with 20 votes per share, and the power to fill the Board with

12   loyalists.  He filled the Company's upper management with friends and family, once reportedly

13   raising a toast to "nepotism" at an executive retreat in Montauk, New York.  He made his wife,

14   Rebekah Neumann, the Company's Chief Brand Officer.  Her brother-in-law served as WeWork's

15   Chief Product Officer.  Defendant Neumann's brother-in-law ran WeWork's fitness offering.  In

16   the absence of any meaningful corporate governance, insider dealing at the Company flourished,

17   even as defendants continued to offer and sell WeWork securities to Class members.

18         80.      Examples are legion.  The Company paid millions of dollars for leases in buildings

19   partially owned by WeWork insiders and their affiliates.  As of June 30, 2019, future undiscounted

20   minimum lease payments under these leases totaled $237 million.  At least four of these properties

21   were owned by defendant Neumann.  The Company also used vendors or contractors owned by

22   family members of executives, including a construction company that built much of the

23   Company's New York offices.  The parents of defendant Gross served as real estate brokers on a

24   WeWork lease in Miami.  Also in Miami, WeWork signed a lease at a building partly owned by

25   WeWork's Co-Head of Real Estate.  In addition, WeWork extended multi-million-dollar loans to

26   Company insiders for personal uses.  Defendant Neumann, through his holding company, alone

27   received $10.4 million in May 2013, $15 million in February 2014, and $7 million in 2016 from

28   the Company.  Several additional Individual Defendants, including Frankfort and Minson,

1   received low interest WeWork loans worth millions more.  In the ultimate act of hypocrisy,

2   defendant Neumann even trademarked the word "We" and then sold it to the Company for $5.9

3   million, although the deal was ultimately unwound amid public outcry after it leaked in 2019.

4          81.    Defendant Neumann used his position and sale of WeWork shares to finance an

5   opulent lifestyle.  He had WeWork's headquarters redone to include an exercise room dedicated

6   only to executives, and his own personal office was bestowed with a sauna and an ice bath.

7   WeWork also renovated its San Francisco corporate headquarters, cutting giant openings in the

8   floor to make way for staircases.  The total costs exceeded $550 for each square foot, roughly three

9   times what WeWork normally spent renovating an office.  WeWork purchased a top-of-the-line

10  private jet, a Gulfstream G650ER, for defendant Neumann for $63 million, which it then upgraded

11  by adding two bedrooms, among other amenities.  Defendant Neumann reportedly used the jet to

12  transport marijuana and regularly engaged in recreational drug use while in flight.

13         82.    At the same time that defendants, including defendant Neumann, were soliciting

14  outside investments in WeWork, he was selling and pledging his own WeWork shares.  In total,

15  defendant Neumann cashed out more than $740 million of his WeWork stock at increasingly lofty

16  valuations, catapulting the CEO into the ranks of the über wealthy.  With the proceeds, he

17  purchased at least five luxury homes, including a 13,000-square foot residence in the Bay Area

18  with a guitar-shaped room and waterslide.  Defendant Neumann's personal staff included at least

19  one driver for the Maybach luxury vehicle, worth hundreds of thousands of dollars, he frequently

20  traveled in.  In early 2019, defendant Neumann relocated his Hawaii-based surf instructor together

21  with the instructor's family to New York.  He paid for their apartment in Manhattan, and some of

22  the instructor's children attended WeGrow, a WeWork educational subsidiary.

23         83.    Many of the Company's vaunted acquisitions were little more than vanity projects,

24  reflecting the personal interests of the Neumanns rather than serving any legitimate business

25  rationale.  For example, WeGrow, a Manhattan elementary school founded by Rebekah Neumann,

26  came about because the Neumanns decided they were unable to find adequate schooling choices

27  for their five children.  Similarly, defendant Neumann caused WeWork to invest $13.8 million in

28  Wavegarden, a Spanish wave pool company, because he liked to surf.  According to a

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE          - 32 -

1    whistleblower complaint filed with the SEC in October 2019, WeWork executives pushed through

2    the $42.5 million acquisition of Spacious, a 3-year-old startup, demanding outside accountants

3    approve the deal without even reviewing the company's financial statements.  All of these deals

4    were rubber stamped by WeWork's Board, which included many of the Individual Defendants,

5    despite the fact that the businesses often bore little relation to WeWork's core business and

6    provided no realistic path to profitability.

7          84.    As would ultimately be revealed, the values defendants ascribed to these business

8    ventures were grossly inflated and their purported strategic import to WeWork's business was

9    misrepresented.  In truth, the businesses acquired by WeWork during the Class Period had little if

10    any value.  In the third quarter of 2019 alone, WeWork recognized a $197 million impairment

11    charge related to its business acquisitions.  The Company was subsequently forced to attempt to

12    divest substantially all of its non-core business lines as it struggled to stay afloat following the

13    failure of its attempted IPO, often at fire-sale prices.

14    **Defendants' Misrepresentations Regarding WeWork's**
**Cash Position and Resilience to a Market Downturn**

15

16          85.    Defendants represented to investors that the Company had sufficient cash flow to

17    support its growth initiatives and utilized a recession-resistant business model.  For example, in a

18    January 14, 2019 *CNBC* television interview, defendant Neumann claimed: "'Our balance sheet

19    has north of $6 [billion] on it.  It's above and beyond what we need to fund the company for the

20    next four to five years.'"  Two months later, in a March 25, 2019 interview with investors and

21    analysts, defendant Gross, WeWork's Vice Chairman, reinforced these claims, representing that

22    WeWork was "sitting on well north of $6 billion in cash, [had] access to a lot of capital in a lot of

23    pockets, and [had] a big opportunity ahead."  In an interview with *Axios* published on May 15,

24    2019, defendant Neumann claimed that WeWork was in such a favorable cash position that it

25    might not go public at all, stating:  "'I don't know that we're going to go public. Every decision

26    here gets made at the time of the decision. We have lots of cash in the bank and access to debt, so

27    we're in no rush.'"

28

1    86.    Defendants also claimed that WeWork was well positioned to withstand a market

2    downturn, because affected tenant companies would purportedly flock to the Company's leases in

3    search of more flexible and lower cost alternatives.   They cited the example of Argentina, where

4    WeWork's occupancy rates purportedly remained above break-even levels in 2018 despite that

5    country's economic crisis.   Pressing this narrative in a January 14, 2019 *CNBC* interview,

6    defendant Neumann stated: "Number one, in Q4 of 2018 we've seen a big drop in the market,

7    WeWork has never grown faster."   He cited the Company's growth in signing up enterprise

8    members as evidence that the Company was achieving stable revenues and cash flows over longer

9    time horizons. He continued: "We have never done better [than in Argentina]," where the country

10   was suffering a "horrific downturn."   He claimed to "see a direct correlation between when the

11   world starts pulling back" and growth in WeWork's business.

12   87.    As defendants knew, the statements in ¶¶85-86 were false and misleading at the

13   time they were made.   The true facts were as follows:

14   (a)    throughout the Class Period, WeWork was hemorrhaging hundreds of

15   millions of dollars annually, not simply to fund growth initiatives, but because its business model

16   lacked core profitability and was cash flow negative;

17   (b)    WeWork required continuous injections of outside investor capital to fund

18   its operations or it would go out of business;

19   (c)    WeWork could not become cash flow positive without, *inter alia*,

20   fundamentally altering its business model to conform with more traditional commercial real estate

21   companies, halting growth initiatives, engaging in drastic spending cuts, and selling off non-core

22   business lines;

23   (d)    by at least December 2018, WeWork needed to complete an IPO in order to

24   stave off an impending liquidity crisis; and

25   (e)    WeWork was particularly vulnerable to an economic downturn due to the

26   duration mismatch associated with WeWork's long-term lease agreements with landlords, totaling

27   billions of dollars, and the shorter, more flexible arrangements that the Company offered its

28   tenants.

88.     WeWork desperately needed to raise cash throughout the Class Period, and it was only by generating continuous injections of outside capital that defendants could maintain the illusion of sustainable growth and a profitable business model.  Indeed, when the Project Fortitude deal with defendant Softbank fell through in late 2018, WeWork did not have sufficient cash flow to last one year, let alone "four to five years," as defendant Neumann had represented, despite the infusion of billions more in capital in January 2019.  In fact, without an IPO to bail defendants out, the Company would be forced to effectively halt all growth initiatives, lay off thousands of workers, divest non-core assets, and drastically cut costs.

89.     WeWork was particularly vulnerable to a market downturn, as its duration mismatch (between its lease terms with tenants and with landlords) meant that, if the economy worsened, WeWork would be forced to charge lower rents to its customers, even while it was still locked into pre-recession contracts with landlords.   As of June 30, 2019, WeWork's future undiscounted fixed minimum lease cost payment obligations totaled $47.2 billion, presenting a systemic risk to the entire U.S. real estate market.  WeWork was particularly susceptible to an economic downturn, because in a downturn it would be exposed to the loss of tenant income, which placed both WeWork and the owner of the property at risk if WeWork failed to make its lease payments.

**The Truth Is Gradually Revealed in the Course of WeWork's Failed IPO**

90.     As detailed herein, WeWork's business model was fundamentally unprofitable and the Company's expansion efforts during the Class Period simply worsened its negative cash flows and pushed profitability further out of reach, necessitating constant capital infusions from outside investors.  Initially, WeWork was able to raise sufficient sums from private investors.  However, as the Company turned to public markets, increased disclosures that were required as part of the IPO process and the scrutiny of the Company in connection therewith ultimately revealed the false and misleading nature of defendants' Class Period misrepresentations.

91.     In December 2018, soon after Project Fortitude fell apart, defendants continued their efforts to sell WeWork securities by frantically pursuing an IPO that would allow them to

1  raise billions of dollars from public investors.  On April 29, 2019, WeWork issued a release

2  announcing that it had confidentially submitted an amended draft registration statement on Form

3  S-1 to the SEC.  A draft was not publicly filed until August 14, 2019, because the SEC had taken

4  issue with numerous representations and omissions in WeWork's planned offering materials,

5  prolonging the time it took for the Company to publicly file a draft registration statement.  When

6  the IPO ultimately failed in September 2019, the SEC still had a list of 13 unresolved concerns

7  relating to the Company's disclosures, despite the fact that WeWork had already responded to

8  dozens of SEC demands over the course of the preceding nine months.  Key concerns included

9  misleading profitability metrics, such as "community-adjusted EBITDA," which WeWork had

10  used to raise millions of dollars in private markets, but which the SEC rejected.  The SEC also

11  forced WeWork to abandon unrealistic projections that it had used to solicit investors, such as a

12  purported workstation utilization rate of 100%, and omit claims that lacked a reasonable basis,

13  such as the statements defendants had been making to investors that each mature location would

14  at some point generate recurring cash flows.

15       92.    Numerous errors and material omissions contained in the registration statement

16  revealed the Company's approach to accounting and financial disclosures.  Despite eight months

17  ostensibly spent preparing WeWork's S-1, the registration statement failed to accurately provide

18  even basic information about WeWork's business.  For example, the initial draft registration

19  statement claimed that the Company delivered 273,000 work stations in the first half of 2019.  A

20  month later, an amended version claimed only 106,000 workstations had been added.  Similarly,

21  the Company initially claimed the gross cost for this expansion totaled $1.3 billion.  By September

22  2019, this number had been revised down to $800 million.  The registration statement also omitted

23  key information, such as the $63 million private jet WeWork had purchased for defendant

24  Neumann and the hundreds of millions of dollars he had pocketed by selling and borrowing against

25  WeWork stock.  Instead, these facts would be revealed through damning media reports and

26  investigative exposés.

27       93.    New details regarding WeWork's business and operating results began to emerge

28  as a result of the more fulsome disclosures included in the S-1.  Investors and analysts were

shocked by the Company's rapidly increasing losses and loss trajectory. In the first six months of 2019, WeWork racked up $2.9 billion in total expenses on $1.5 billion in revenues. In its draft S-1, WeWork revealed that its "net loss may increase as a percentage of revenue in the near term and will continue to grow on an absolute basis." It appeared the Company was scaling its losses as fast, if not faster, than the overall business, casting doubt on defendants' claims that a viable path to profitability existed and that the Company's growth trajectory was sustainable.

94. According to experts, WeWork's $47.2 billion in lease liabilities would threaten the Company financially in an economic downturn or recession; and, worse yet, they potentially posed a systemic risk to the entire U.S. real estate industry. As *Quartz* reported on September 22, 2019, in relevant part:

> Investors have been wary of WeWork's corporate governance, leading the co-working startup to delay its initial public offering plans. But the company's business itself is coming under additional scrutiny as well.
>
> A US central banker was the latest to cast doubt on the co-working business model. Boston Federal Reserve Bank president Eric Rosenberg warned that the growing popularity of co-working amplifies risks to the US economy during the next economic downturn.
>
> Rosenberg, who has publicly dissented from the Fed's recent interest rate cuts, did not mention WeWork in his Sept. 20 remarks, but said he believes the co-working model could run into "runs and vacancies." Co-working spaces like WeWork sign long-term leases with property owners, and then sublease the offices to tenants through short-term leases and memberships. An economic downturn could leave WeWork with expensive long-term commitments and not enough revenue to cover them if its customers cut their office-related spending.

95. The value of WeWork investors' holdings continued to decline as the troubling details regarding WeWork's poor governance, lack of transparency and reckless expansion came to light. For example, news reports revealed that despite his generous compensation, defendant Neumann regularly skipped Board meetings, sending his deputies to attend in his stead while he jetted off on surf trips to far flung locations such as the Dominican Republic, the Maldives, and Costa Rica. Although he ostensibly owed WeWork millions of dollars for personal expenses as a result of these jaunts, the debt was never repaid. Even when defendant Neumann was ostensibly working, he often did so while inebriated on drugs and alcohol, a fact that was widely known

among the Individual Defendants and defendant Softbank.  As *The Wall Street Journal* reported:

"The more investors learned about WeWork, the less they liked it."

96.    A September 11, 2019 *Wall Street Journal* article, entitled "Why WeWork Is Struggling to Sell Its Story to Investors," stated, in relevant part, as follows:

> ***The shared-office company is having a hard time convincing potential public-market investors it's worth the $47 billion private investors have valued it***
>
> WeWork's parent, We Co., has raised billions of dollars from private investors, including SoftBank Group Corp. at a $47 billion valuation.  The shared-office company is having a harder time convincing potential public-market investors it's worth even half that much ahead of a planned initial public offering.  Here are some of the issues investors are weighing as they scrutinize the business and growth prospects of We, which declined to comment.
>
> **We's revenue is growing fast, but so are its expenses**.
>
> In 2018, We took in $1.8 billion in revenue – but for every dollar the company generated, it spent nearly two.  The biggest expense: rent to landlords, which is equal to 65% of We's revenue.
>
> **We's operating losses are keeping pace with its revenues**.
>
> Investors aren't necessarily expecting startups to be profitable by the time they go public.  However, a company's ability to show that losses are slowing or shrinking – even as the company grows – often gives investors comfort the business is sound, and will eventually turn a profit.  Many companies that went public this year show a widening gap between revenues and operating losses – but the two measures are growing in tandem for We.
>
> **We is raising increasingly large sums** . . .
>
> We has raised more than $10 billion in nine years by turning to venture capital firms, then banks, then mutual funds and ultimately SoftBank.  The cash has, in turn, been used to build out We's growing number of offices.
>
> **. . . but has yet to announce a profit**.
>
> It's not unusual for technology startups to raise lots of money before they turn profitable, as the firms are often more focused in the early years on growing and creating new markets for their products and services.  For instance, many of today's batch of giant startups expect to stay in the red for far longer than a decade.  Still, investors do expect to see a clear path to profitability and We hasn't disclosed any profits since its founding in 2010.
>
> **And a profitable, publicly-traded rival is valued at far less**.
>
> IWG PLC, known for its Regus brand, has office and co-working spaces that compete with We and the two companies had a similar number of occupied desks as of mid-2019.  But the Switzerland-based IWG has a market capitalization that is about one-tenth the value investors assigned We in January.

97.     At around the same time, *PitchBook* posted a report on "WeWork's wild ride," stating, in relevant part, as follows:

Ever since WeWork made its IPO prospectus public in mid-August, the company has been surrounded by a cacophony of criticism.  Some of it has been about silly stuff, like WeWork's insistence that it wants to elevate the world's consciousness, or whatever.  Some of it has been a lot more serious, like whether the company's business model will allow it to ever be anything more than a gigantic, well-decorated money pit.

Apparently, the heat isn't only coming from snarky media members like me. The Wall Street Journal published an eye-opening report on Thursday that, with potential investors skeptical about both its business model and its corporate governance, WeWork is now planning an IPO valuation of somewhere around $20 billion, a massive drop from the $47 billion valuation SoftBank lavished on the company in January.  The WSJ also reported that CEO Adam Neumann traveled to Japan last week to meet with SoftBank leader Masayoshi Son, seeking additional capital and discussing a potential delay of WeWork's public debut into next year.

*     *     *

There were two other WeWork developments this week that seemed in part like attempts to stem the tide of criticism that's overwhelmed the company in recent weeks.  The company announced the addition of Frances Frei as a new board member, with the Harvard Business School professor and former Uber executive becoming the first woman to sit on its board.  WeWork also revealed that Neumann has given back $5.9 million in stock that he received earlier this year for transferring the "we" trademark to the company, a widely condemned bit of shady self-dealing.

Considering the vitriol the deal inspired, Matt Levine of Bloomberg was accurate this week in calling it "a staggeringly dumb transaction." It seems certain that the negative economic impact of Neumann paying himself for the rights to the company's new name has been a whole lot more than $5.9 million.

Maybe self-awareness just isn't Neumann's strong point.  Another piece of evidence for that case would be a statement the WeWork CEO made in a meeting with analysts this week when he criticized other unicorns for – wait for it – spending too much cash to fuel growth.  "I look a little bit around at Uber and Lyft," he said, per Bloomberg.  "I think there were growth issues.  I think when you grow at any price there are consequences."

Someone get this man a mirror.

The string of gaffes and eye-rolling statements gets at an interesting question: Would postponing its IPO really help matters for WeWork? If investors aren't buying what the company is selling now, will another six or 12 months really change things? Sure, WeWork could keep acquiring other startups and continue its attempts at world-conquering diversification.  But there's little sign of a change in the matter of a larger problem: Whether the valuation is $47 billion or $20 billion, most investors seem to think WeWork isn't worth it.

98.     In an effort to assuage investors' concerns, on September 13, 2019, WeWork announced a series of corporate governance changes.  These included, among other things, a

reduction in defendant Neumann's voting power and eliminating the stipulation that his wife could help choose his replacement should he die.   A *Wall Street Journal* article, reporting on the governance changes, described WeWork's moves, in relevant part, as follows:

> We spelled out a series of corporate-governance changes in a regulatory filing released Friday, saying the company would appoint a lead independent director by the end of the year.   We Co-founder and Chief Executive Adam Neumann also ratcheted back the potency of his voting rights to 10 votes per share from 20 votes per share, reversing a recent enhancement to their power.   The company also eliminated a provision in which his wife, Rebekah Neumann – also a We co-founder – would play a key role in choosing Mr. Neumann's successor if he dies or is permanently disabled in the next 10 years.

> The company also said that Mr. Neumann, who previously said he wouldn't sell shares for a year after the IPO, would sell no more than 10% of his shareholdings in the second and third years after the offering.

> Potential investors also have questioned Mr. Neumann's sales of hundreds of millions of dollars of We stock and loans of more than $740 million tied to his shares in the company, according to Wall Street Journal reports and regulatory filings.

> We officials and their advisers have been in an intensive series of meetings in recent days as questions swirl over whether the company will go through with the offering, one of the biggest in what could be a record year for new issues.   But the choosing of a listing venue, together with the expected valuation cut and governance overhaul, show that it has decided to plow forward – even if that means raising less that it had originally hoped.

> One major motivating factor is $6 billion in loans We has arranged that are contingent on at least $3 billion being raised in the share offering.

99.     The changes did little to quiet concerns about WeWork's corporate culture and governance, however.   Rather, the criticism grew louder as reporting exposed additional problems with WeWork's prior valuations.   For example, a September 17, 2019, *Slate* article reported, in relevant part, as follows:

> WeWork's business model involves leasing buildings, decking them out with sleek interior designs and luxury perks like arcades, taking care of utilities, and then subleasing to businesses at a premium.   A major concern for investors is reportedly the lack of a clear path for the company to achieve profitability.   In the first half of 2019, WeWork reported revenues of $1.5 billion and operating losses of $1.4 billion.   While these sorts of numbers may have gotten a pass in the past, investors have lately grown wary of unicorns subsidized by bucket loads of venture capital.   Shares of Uber and Lyft, companies that are both unprofitable, notably took a major hit after debuting on the market in the spring.   In the event of a recession, analysts are unsure whether WeWork will be able to weather an exodus of clients who may want to downsize.   Even when clients aren't occupying WeWork's spaces, the company is still contractually obligated to pay rent to the

building owners.  In other words, while it may have the sheen of a tech startup, WeWork is beholden to the fundamentals of the real estate business.

An unclear path to profitability contributed to a fiasco with WeWork's valuation.  In January, the company had boasted a $47 billion valuation, which would have set it up for the biggest IPO of the year.  This was thanks in part to a $2 billion investment from SoftBank, one of the company's biggest backers.  In early September, WeWork slashed the number to $20 billion, one of the most dramatic valuation reductions in the history of IPOs.  There are now reports that the company could debut between $10 billion and $12 billion.

The company's co-founder and CEO, Adam Neumann, is another source of consternation.  Controversies around potential conflicts of interest have plagued the 40-year-old tech mogul.  The Wall Street Journal reported in January that Neumann had been leasing buildings he owns himself to WeWork, possibly allowing him to personally profit from the company's rents.

He's also tried to buy smaller stakes in buildings that WeWork planned to lease, only for the company's board to stop him.  In another unusual move, Neumann received a $7 million loan from his company and sold $700 million of shares in July.

The CEO has further wielded outsize voting power for board decisions and at one time held 2.4 million Class A shares, 113 million Class B shares, and 1.1 million Class C shares.  On Friday, WeWork tried to assuage investors by reducing Neumann's control, partly by halving the number of votes allotted to another class of special stocks he owns.  Even so, he will still be in control of a majority of shareholder votes.  The company has also stated that Neumann will not be allowed to sell any shares for the first year after the IPO and will only be able to sell 10 percent of his stake in the second and third years.

"The We Company is looking forward to our upcoming IPO, which we expect to be completed by the end of the year," the company said in a statement on the IPO delay.  "We want to thank all of our employees, members and partners for their ongoing commitment." For now, they'll have to commit to waiting.

100.    Echoing these concerns, on September 16, 2019, *Inc.* wrote, in relevant part, as follows:

What a difference four weeks makes.

WeWork's path to becoming a public company has gone from promising (if ambitious) to approaching a train wreck.

The We Company, WeWork's parent organization, which had at one point reached a $47 billion valuation after a funding round in January, was reportedly considering going public at a valuation as low as $10 billion.  This despite raising more than $12 billion in funding to date.  On Sept. 16, the company issued a statement saying it is delaying the IPO and expects to complete the offering by the end of the year.

We's beleaguered initial public offering has elicited questions and concerns about its corporate governance since the company unveiled its IPO paperwork last month.  At the center of the controversy is co-founder and CEO Adam Neumann,

who, despite not taking a salary in 2018, sold the trademark "We" to his own company for $5.9 million. Neumann has since returned the money. On Friday, We attempted to course correct further. The company said it was reducing Neumann's supervoting power from 20 to 10 votes per share. It also scrapped a proposed plan that allowed Neumann's wife Rebekah to pick his successor under certain circumstances.

For a business that claims its mission is to "elevate the world's consciousness," We's IPO process reveals a glaring lack of self-awareness. In case you missed it, here are a few of the biggest issues threatening the IPO, and what the company is doing to fix them before it starts trading on Nasdaq later this year.

**Neumann's finances and influence**

Controversy over the "We" trademark is only the tip of the iceberg. WeWork's founder and CEO has cashed out around $700 million via stock sales and loans, the *Wall Street Journal* reported in July. The figure has caused concern among investors because it raises questions about Neumann's confidence in the success of his company. The company's IPO documents also revealed Neumann has an ownership stake in four buildings where WeWork is a tenant, a fact some people have criticized as a potential conflict of interest.

On Friday, the company said Neumann would give We "any profits he receives from the real estate transactions he has entered into with the company." It also stated Neumann would not be allowed to sell any of his stock for the first year following the IPO, and limit his ability to sell shares on the second and third year to no more than 10 percent of his stake. The new filing also said We's board of directors could remove Neumann from its CEO role and promised to add one more director within a year of the company's IPO. In September, We recruited HBS professor Frances Frei to its board, following criticisms for having an all-male board of directors.

**Inflated valuation**

WeWork's $47 billion valuation has raised more than a few eyebrows among public investors. The company, which made $1.8 billion in revenue last year, is still unprofitable and booked a $1.6 billion loss in 2018. In the first six months of this year, We also reported a $1.3 billion loss on revenue of $1.5 billion. For comparison, publicly-traded competitor IWG, which also rents co-working spaces to companies and individuals, has a market cap of $3.5 billion as of the writing of this piece. Unlike WeWork and its parent company, IWG is profitable – it banked an operating profit of £50.6 million ($62.8 million) on $1.6 billion in revenue for the first half of 2019.

To allay investors' concerns, We is considering cutting its valuation down to $10 billion or $12 billion, according to Reuters. WeWork's dramatically shrinking valuation has been met with resistance by Softbank, which has already poured around $10 billion into the company. Softbank has asked We to shelve its IPO plans until 2020, according to a September 9 report by the *Financial Times*. Given We seems determined to move forward with the offering, however, Softbank is weighing buying up to $750 million worth of shares on its IPO, the *Journal* reported Friday.

**Transparency**

     One of the biggest questions around WeWork is its path to profitability and the viability of its business model.  Because We's business model hinges on securing long-term leases and then subleasing those spaces to its tenants at a premium for short-term durations, the company must pay the rent even when there's no one occupying the buildings.  According to its financial disclosures, We is on the hook for $47 billion in long-term leases.  To minimize its risks, the company increasingly has signed on enterprise customers, which tend to have longer lease commitments and now represent 40 percent of its customer base, compared to 20 percent in 2017.  Still, some worry that the way We reports its results does not give investors sufficient insight into the company's finances.

     Much of the trouble in which We currently finds itself could have been resolved – or at least tempered – long before the company subjected its financials and corporate governance to public scrutiny.  Neumann's double role as tenant and landlord, for instance, had already drawn criticism in January.  The bigger concern is, why didn't We and its leadership realize how many red flags its own long list of disclosures would raise?  It's a tough business trying to raise the world's consciousness, especially when you have yet to do enough soul-searching of your own.

101.    On September 17, 2019, in response to the barrage of criticism lambasting the Company and exposing its flawed business model and corrupt management culture, WeWork delayed its IPO until mid-October 2019.  In a release, WeWork stated:  "The We Company is looking forward to our upcoming IPO, which we expect to be completed by the end of the year."

102.    A few days later, on September 24, 2019, WeWork announced leadership changes that included defendant Neumann stepping down from his role as CEO.  However, he retained his position as Chairman as well as his voting control over the Company.  The release regarding defendant Neumann's firing as WeWork's CEO stated, in relevant part, as follows:

     WeWork's Board of Directors today announced the following leadership changes: Co-founder Adam Neumann has decided to step back from his role as CEO, and will continue on as non-executive chairman of the board.  WeWork's Artie Minson, formerly co-president and chief financial officer, and Sebastian Gunningham, formerly vice chairman, have been named co-CEOs of the company.  These changes are effective immediately.

     Adam Neumann said: "As co-founder of WeWork, I am so proud of this team and the incredible company that we have built over the last decade. Our global platform now spans 111 cities in 29 countries, serving more than 527,000 members each day. While our business has never been stronger, in recent weeks, the scrutiny directed toward me has become a significant distraction, and I have decided that it is in the best interest of the company to step down as chief executive.  Thank you to my colleagues, our members, our landlord partners, and our investors for continuing to believe in this great business."

Artie Minson and Sebastian Gunningham said: "We would like to thank Adam for his vision and his passion in building WeWork over the past 9 years. Our innovative membership model, beautiful designs and inventive community offerings have changed the way individuals and enterprises around the world think about their workspaces. It is an incredible honor to lead WeWork during this important moment in the company's history. Our core business is strong and we will be taking clear actions to balance WeWork's high growth, profitability and unique member experience while also evaluating the optimal timing for an IPO. We are committed to the continued success of our members, partners, employees and shareholders on this new journey."

Board member Bruce Dunlevie, a partner at Benchmark and early investor in WeWork, said: "Adam has overseen the creation of a global platform that supports its members daily, and has grown to more than $4 billion in run-rate revenue in less than ten years. He and the WeWork team have redefined the ways in which people and companies approach work, and brought innovation to the real estate industry. I am excited about the future of WeWork and thrilled to have Artie and Sebastian take the baton from Adam to lead the next phase of growth."

Board member Lew Frankfort said: "Adam is that very rare breed of entrepreneur who has the vision and drive to conceptualize an enormous business opportunity and then attack it relentlessly. He has created one of the fastest growing businesses in history, and my fellow directors and I thank him for his leadership. Our board of directors is excited to welcome Artie and Sebastian as leaders of WeWork in its next phase, and are pleased by the company's rapid growth trajectory and industry-leading position in the market."

103.    The negativity surrounding WeWork's IPO continued unabated, however. As late September 2019 unfolded, investor interest in WeWork going public continued to erode. Finally, on September 30, 2019, WeWork suspended its IPO indefinitely.

104.    Almost immediately after WeWork pulled its IPO, reports surfaced about the Company's imminent financial demise without the expected proceeds of a public offering. Compounding WeWork's financial distress, the failed IPO prevented the Company from being able to access $6 billion in additional debt financing that was contingent on the Company conducting a successful capital raise.

105.    On September 30, 2019, *The Wall Street Journal* reported the Company "could be out of money by early 2020," stating, in relevant part, as follows:

For years, WeWork's parent company was defined by big spending as it relentlessly pursued rapid growth.

Now, in the aftermath of a botched initial public offering attempt and the ouster of co-founder and chief executive Adam Neumann, it is facing a different reality: It needs to stop bleeding cash.

On Monday, We Co. said it would file a request with the Securities and Exchange Commission to withdraw its IPO proposal.  The company said it is postponing the offering to focus on its core business and that it has "every intention to operate WeWork as a public company" but didn't provide a time frame.

To cut costs, the company's new co-CEOs, Sebastian Gunningham and Artie Minson, are planning thousands of job cuts, putting extraneous businesses up for sale and purging some luxuries from the previous CEO, such as a G650ER jet purchased for more than $60 million last year, people familiar with the matter have said.

New York-based We had $2.5 billion in cash as of June 30.  At the current rate of cash burn – about $700 million a quarter – it would run out of money sometime after the first quarter of 2020, according to Chris Lane, an analyst at Sanford C. Bernstein & Co.  Mr. Lane and his colleagues projected in a recent note to clients that We would burn through nearly $10 billion in cash between 2019 and 2022, assuming it keeps growing.

Messrs. Gunningham and Minson said in a joint email to We staff last week that they "anticipate difficult decisions ahead."

"As we look toward a future IPO, we will closely review all aspects of our company with the intention of strengthening our core business and improving our management and operations," the co-CEOs wrote.

Further adding pressure are agreements We made in a bond offering last year for which it must keep at least $500 million of cash, according to S&P Global Ratings, which downgraded We's bonds last week.

The company, which provides shared workspaces, had expected a huge infusion of cash in a public offering.  But skepticism from prospective public market investors helped lead to the IPO's delay and the subsequent replacement of Mr. Neumann with two of his former deputies, and now investors don't foresee an IPO until next year.  The company is in early talks to raise money from private investors, people familiar with those discussions have said.

The sudden desire to execute cuts contrasts with the picture long painted by Mr. Neumann and other We executives, including Mr. Minson, who stressed that the company had plenty of cash and that losses were nothing to worry about.

Subsequent to the company's founding in 2010, the internal mantra was that the large losses were the result of We's rapid growth.  Because so much of the money was going to new locations, if the business stopped expanding it could be profitable, Mr. Neumann would tell staff.

But the scale of its losses, even for a fast-growing co-working company, has perplexed rivals and others in the real-estate sector.  Taken with the cuts, analysts say, it suggests problems extend beyond Mr. Neumann to the underlying health and strategy of the business.

"Something is wrong," said Nori Gerardo Lietz, a lecturer on real estate and venture capital at Harvard Business School who recently published an analysis of the company.  "They're not managing their growth – they're spending money like drunken sailors," and their general and administrative costs are growing too fast, she said.

1

2

> Ms. Lietz said the disclosures in We's IPO prospectus don't adequately explain the problems at the root of the large losses, which totaled more than $1.6 billion in 2018.

3

4

> A danger for We in cutting costs is that the moves would drag down its growth rates. The company has doubled its revenue most every year – a quality it long hoped investors would focus on. With slower growth, investors say they would need to see a clear road to profitability.

5

6

7

> No matter the growth rate, the business is expected to need lots of cash to build out its offices. We reported spending $1.3 billion in net capital costs in 2018 – only a portion of which shows up in the company's official losses because those costs are accounted for over many year.

8       106.    A few days later, on October 4, 2019, *Inc.* reported that WeWork was planning to

9  lay off between 10% and 25% of its workforce, stating, in relevant part, as follows:

10

11

> WeWork is planning massive layoffs that will number in the thousands as the new leaders of the embattled shared-space company look to focus on its core business and reduce costs, a source familiar with the matter said.

12

13

> WeWork executives haven't yet finalized the specific cuts, but the numbers will be "in the thousands" – though less than the 3,000 to 5,000 layoffs that had been laid out in earlier media reports, the source said.

14

15

> WeWork has about 12,500 employees, so a cut of 1,000 to 3,000 people would be about 10 to 25 percent of its staff.

16

> Bloomberg reported earlier on Thursday that WeWork had announced layoffs to staff but did not provide a number.

17

18

> Job cuts have been rumored for weeks as cofounder Adam Neumann stepped down and new co-CEOs Artie Minson and Sebastian Gunningham stepped in to replace the unconventional leader.

19       107.    The Company's cash crunch was so severe that new Co-CEOs, defendant Minson

20  and Sebastian Gunningham, had to delay the layoffs until WeWork raised enough money to afford

21  severance payments. The Company employed draconian cost-cutting measures and almost all of

22  the disparate business lines that WeWork had acquired over the years were placed on the selling

23  block.

24       108.    Despite these efforts, WeWork's business continued to decline, and it risked

25  running out of cash by the end of October 2019. In the third quarter of 2019 alone, WeWork lost

26  $1.25 billion, more than double its losses in the same period a year earlier. Reasons included a

27  growth in leasing costs and ballooning losses from the non-core businesses that defendant

28  Neumann had added to the WeWork empire. The Company reported a $197 million impairment

1    charge related to some of these business lines in connection with its third quarter 2019 financial

2    results.

3          109.    In sum, WeWork faced decelerating growth prospects, executive defections, a

4    bloated corporate structure, mounting losses, and an impending cash crisis.  To overcome this

5    desperate situation, on October 22, 2019, defendants announced SoftBank's acquisition of an 80%

6    controlling interest in WeWork for $8 billion, consisting of $5 billion in new financing and a $3

7    billion tender offer to existing shareholders, in addition to the acceleration of $1.5 billion in

8    previously planned financing.  The release announcing the deal stated, in relevant part, as follows:

> The We Company ("WeWork" or the "Company") and SoftBank Group Corp. (or
> "SoftBank") today announced an agreement under which SoftBank commits to
> provide significant funding to the Company.  This includes $5 billion in new
> financing and the launching of a tender offer by SoftBank of up to $3 billion for
> existing shareholders.  Additionally, SoftBank will be accelerating an existing
> commitment to fund $1.5 billion.  The funding provides WeWork with significant
> liquidity to execute its business plan to accelerate the Company's path to
> profitability and positive free cash flow.
>
> After closing, and following the tender offer, SoftBank's fully diluted
> economic ownership of WeWork will be approximately 80 percent.   Since
> SoftBank will not hold a majority of voting rights at any general stockholder
> meeting or board of directors ("Board") meeting and does not control the Company,
> WeWork will not be a subsidiary of SoftBank.  WeWork will be an associate of
> SoftBank.
>
> "SoftBank is a firm believer that the world is undergoing a massive
> transformation in the way people work.  WeWork is at the forefront of this
> revolution.  It is not unusual for the world's leading technology disruptors to
> experience growth challenges as the one WeWork just faced.  Since the vision
> remains unchanged, SoftBank has decided to double down on the company by
> providing a significant capital infusion and operational support.  We remain
> committed to WeWork, its employees, its member customers and landlords," said
> Masayoshi Son, Chairman & CEO of SoftBank Group Corp.
>
> In connection with the agreement, WeWork's Board will appoint Marcelo
> Claure, Chief Operating Officer of SoftBank Group Corp., to the position of
> Executive Chairman of the Board of Directors of WeWork, effective upon closing
> of the accelerated $1.5 billion payment commitment.  Adam Neumann, the founder
> of the Company, will become a Board observer.  The size of the Board will be
> expanded and it will receive voting control over Mr. Neumann's shares.
>
> "WeWork is redefining the nature of work by creating meaningful
> experiences through integrating design, technology and community.  The new
> capital SoftBank is providing will restore momentum to the company and I am
> committed to delivering profitability and positive free cash flow.  As important as
> the financial implications, this investment demonstrates our confidence in WeWork
> and its ability to continue to lead in disrupting the commercial real estate market by
> delivering flexible, collaborative and productive work environments to our

1   customers.  I look forward to helping WeWork realize its vision for the benefit of
2   WeWork employees, members, landlords and communities worldwide," said
    Marcelo Claure.

3   110.    The price that Softbank received in the bailout valued WeWork at less than $8

4   billion.  By November 2019, Softbank had reportedly marked down its internal WeWork valuation

5   to less than $5 billion, a stunning *90% decline* in less than a year.  This drastic depreciation in

6   value has caused the Company's outside shareholders to suffer severe investment losses.

7   111.    On the same date as the Softbank rescue package was announced, defendants

8   announced that, in exchange for stepping down as WeWork's Chairman, defendant Neumann

9   would receive a severance package worth up to $1.7 billion.  Under his termination deal, which is

10  one of the largest in U.S. corporate history, defendant Neumann could sell around $1 billion in

11  stock back to defendant SoftBank, received a $500 million loan to repay a credit line, and, in a

12  provision that made disgraced AIG executive Joseph Cassano's $1 million per month severance

13  look paltry, defendant Neumann is paid an incredible $185 million "consulting fee."  Despite

14  causing what one commentator called a "Hindenburg-level catastrophe," defendant Neumann was

15  being richly rewarded for his role in the disaster in addition to "retain[ing] a stake in the company

16  and remain[ing] an observer on the board of directors."

17  112.    By contrast, "most We employees are left holding stock options that are underwater

18  at the roughly $20-a-share valuation implied by the SoftBank deal," as *The Wall Street Journal*

19  reported on October 22, 2019.  "That leaves them with little beyond their salaries and – for

20  thousands set to be laid off – any severance."  A follow-up article by *The Wall Street Journal*

21  stated that employees were frustrated because of the misleading impression regarding the value of

22  the stock provided by defendant Neumann.  The article stated that "Mr. Neumann, when recruiting

23  . . . , would emphasize his belief that stock awards would in a few years be worth many times what

24  he was offering these people given the trajectory of the company."  This caused employees to buy

25  "the stock at the grant price thinking the stock's value was worth much more, only to see it

26  plummet recently."

27

28

113.     Adding insult to injury, on November 14, 2019, *TheRealDeal* reported that SoftBank had delayed a planned $3 billion tender offer to WeWork investors, which would have allowed them to recoup at least some of their losses.  The report stated, in relevant part, as follows:

> After everything that's happened at WeWork, shareholders now have a new worry.
>
> SoftBank is delaying a $3 billion tender offer for WeWork shareholders.  In a letter WeWork sent to shareholders Nov. 8, and obtained by *The Real Deal*, the Japanese conglomerate's offer would commence "within five business days of the completion" a $1.5 billion investment in the struggling office startup.
>
> That $1.5 billion payment was released to the company Oct. 30, which would have made the deadline for the tender offer Wednesday, Nov. 6.  But no offer was extended, sources said.
>
> The delay is the latest pang of uncertainty for WeWork investors, many of whom are employees whose compensation packages include company stock.

114.     In April 2020, defendant Softbank announced that it was pulling its tender offer completely, effectively leaving existing Company shareholders with illiquid shares worth a fraction of their prior valuation.  Among the reasons for its decision, defendant Softbank cited regulatory probes into the Company's operations.  Several regulatory agencies – including the SEC, the U.S. Attorney's Office for the Southern District of New York, the New York Attorney General, the Manhattan District Attorney, and the California Attorney General – are investigating WeWork's financial condition, communications with investors, and business dealings with defendant Neumann.  Notably, in court filings WeWork has acknowledged that "[t]he investigations were not a surprise, given Neumann's conduct and the Company's loss of billions in value."  Defendant Softbank, based on its own extensive knowledge of the facts underlying the investigations, has concluded that the myriad criminal and civil investigations are "reasonably . . . expected to result in [a] material liability" to WeWork.

115.     Far from performing the way defendants had represented it would in a down economy, WeWork has reached the point of collapse.  WeWork has suffered staggering losses, with current tenants failing to make payments and new tenants reportedly avoiding its offices "like . . . the plague."  While the Company has not provided recent financials, the price of its bonds has collapsed to less than 35 cents on the dollar because of concerns regarding the Company's cash

1  flow and ability to withstand the market downturn.  On April 29, 2020, defendant Softbank wrote
2  down its WeWork investment by $6.6 billion and withdrew the $3 billion tender offer.  As
3  observed by an analyst at Redex Holdings, "'Every writedown takes WeWork's carrying value
4  closer to reality.  Clearly the value is zero . . . .'"

5      116.   In total, as a result of defendants' violations of law, plaintiff and other members of
6  the Class have suffered hundreds of millions of dollars in losses.

7                          **CLASS ACTION ALLEGATIONS**

8      117.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules
9  of Civil Procedure and seeks certification of the following class:  All persons who, directly or
10 indirectly, purchased WeWork securities during the Class Period (the "Class").  Excluded from
11 the Class are defendants and their immediate families, the officers and directors of WeWork and
12 members of their immediate families, their legal representatives, heirs, successors or assigns, and
13 any entity in which defendants have or had a controlling interest.

14     118.   The members of the Class are so numerous that joinder of all members is
15 impracticable.  Plaintiff believes that there are several hundred members in the Class.  Members
16 of the Class may be identified from records maintained by defendants.

17     119.   Plaintiff's claims are typical of the claims of the members of the Class as all
18 members of the Class are similarly affected by defendants' wrongful conduct as alleged herein.

19     120.   Plaintiff will fairly and adequately protect the interests of the members of the Class
20 and has retained counsel competent and experienced in complex class litigation.

21     121.   Common questions of law and fact exist as to all members of the Class and
22 predominate over any questions solely affecting individual members of the Class.  Among the
23 questions of law and fact common to the Class are:

24          (a)   whether defendants misrepresented material facts;

25          (b)   whether defendants' statements omitted material facts necessary to make
26 the statements made, in light of the circumstances under which they were made, not misleading;

27          (c)   whether defendants knew or had reasonable grounds to believe that their
28 statements were false or misleading;

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE          - 50 -

(d)      whether defendants' statements were made for inducing the purchase of WeWork securities by others; and

(e)      the extent of damage sustained by Class members.

122.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joining all Class members is impracticable, and this action will be manageable as a class action.

## COUNT I

### For Violation of Cal. Corp. Code §§25400(d) and 25500 Against All Defendants

123.    Plaintiff incorporates ¶¶1-122.

124.    Defendants directly and/or indirectly, for the purpose of inducing the purchase of WeWork securities by others, made or materially participated in making the statements alleged in this complaint, each of which contained false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

125.    Defendants were aware that these statements and omissions were false and misleading.

126.    Each of the defendants sold or offered to sell WeWork securities and, for the purpose of inducing the purchase by others of such securities, willfully participated in the making of statements that were false and misleading or that omitted material facts necessary to make the statements made not false or misleading and that each defendant knew or had reasonable grounds to believe were false and misleading as detailed herein.

127.    As a result of defendants' misconduct, plaintiff and the other members of the Class have suffered damages because they paid prices for WeWork securities that were affected by defendants' misrepresentations and omissions.  At the time of the purchases by plaintiff and the members of the Class of WeWork securities, the fair market value of such securities was substantially less than the prices paid by them.

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE                    - 51 -

128.    As a direct and proximate result of defendants' violation of law described herein, plaintiff and members of the Class have been damaged.

## COUNT II

### For Violation of Cal. Corp. Code §§25401 and 25501 Against Defendant WeWork and the Individual Defendants

129.    Plaintiff incorporates ¶¶1-122.

130.    This claim is brought on behalf of those Class members who purchased WeWork securities from WeWork and/or the Individual Defendants.

131.    Defendant WeWork and the Individual Defendants offered to sell and/or sold securities to plaintiff and members of the Class in and from this state by means of written and oral communications that included untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading.

132.    The defendants named herein failed to exercise reasonable care to ensure the truth and accuracy of such statements, and plaintiff had no knowledge of the falsity of such statements.

133.    As a direct and proximate result of WeWork's and the Individual Defendants' violations of law described herein, plaintiff and members of the Class have been damaged.

## COUNT III

### For Violation of Cal. Corp. Code §25504 Against Defendant Softbank and the Individual Defendants

134.    Plaintiff incorporates ¶¶1-122.

135.    This claim is brought on behalf of those Class members who purchased WeWork securities from WeWork and/or the Individual Defendants.

136.    Each of the defendants named herein directly or indirectly controlled a person liable under §25501, and/or is a partner, executive officer or director (or occupies a similar status or performs similar functions) of a firm or corporation so liable, or is an employee of a person so liable.

1    137.    Each of these defendants materially aided in the act or transaction constituting the

2  violation of §25501 and knew or had reasonable grounds to believe in the existence of the facts by

3  reason of which the liability exists.

4                                    **PRAYER FOR RELIEF**

5        WHEREFORE, plaintiff prays for judgment as follows:

6        A.    Determining that this action is a proper class action, certifying plaintiff as Class

7  representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's

8  counsel as Class counsel;

9        B.    Awarding compensatory damages in favor of plaintiff and the other Class members

10  against all defendants, jointly and severally, for all damages sustained as a result of defendants'

11  wrongdoing, in an amount to be proven at trial, including interest thereon;

12       C.    Awarding rescission or a rescissory measure of damages;

13       D.    Disgorgement of defendants' ill-gotten gains;

14       E.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in

15  this action, including counsel fees and expert fees; and

16       F.    Awarding such other and further relief as the Court may deem just and proper.

17                                    **JURY DEMAND**

18       Plaintiff demands a trial by jury.

19  DATED:  June 3, 2020                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
20                                          SHAWN A. WILLIAMS

21
                                                  *s/ Shawn A. Williams*
22                                          SHAWN A. WILLIAMS

23                                          Post Montgomery Center
                                            One Montgomery Street, Suite 1800
24                                          San Francisco, CA  94104
                                            Telephone:  415/288-4545
25                                          415/288-4534 (fax)
                                            shawnw@rgrdlaw.com

26

27

28

COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE          - 53 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
TRAVIS E. DOWNS III
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
travisd@rgdlaw.com
bcochran@rgrdlaw.com

Attorneys for Plaintiff