ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
JASON C. DAVIS (253370)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com
        – and –
DARREN J. ROBBINS (168593)
TRAVIS E. DOWNS III (148274)
BRIAN E. COCHRAN (286202)
JUAN CARLOS SANCHEZ (301834)
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdaw.com
travisd@rgrdlaw.com
bcochran@rgrdlaw.com
jsanchez@rgrdlaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MALAKYAR VERNET, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> THE WE COMPANY, et al., <br><br> Defendants. <br> | Master File No. 4:20-cv-03686-HSG <br><br> <u>CLASS ACTION</u> <br><br> CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE |
| This Document Relates To: <br><br> ALL ACTIONS. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

JURISDICTION AND VENUE ..................................................................................4

THE PARTIES AND KEY NON-PARTIES .............................................................5

FACTUAL ALLEGATIONS ......................................................................................8

I.      The Rise of WeWork .......................................................................................8

II.     SoftBank Tells Neumann He Is Not "Crazy Enough" in Pursuing Growth ...................11

III.    SoftBank Urges WeWork to Grow 25 Times Bigger ..................................12

IV.     WeWork's Business Model Breaks Under Growth Pressure ...........................13

        A.     Lease Underwriting Was Core to WeWork's Business ................13

        B.     Lease Underwriting Was WeWork's "Single Biggest" Growth Driver ...............14

        C.     WeWork Fabricates Lease Underwriting Metrics to Fuel Growth ...................14

        D.     WeWork Designs Earnings Systems to Obfuscate the Business's True Value .........15

V.      SoftBank's and Neumann's $15 Billion "Project Fortitude" Deal Aims to Take Control of WeWork in Advance of Its Initial Public Offering ...........................16

        A.     Neumann and SoftBank Meet in California ..........................16

        B.     SoftBank's Due Diligence on WeWork's Operations ...................17

VI.     SoftBank and Neumann Create a New Device to Inflate WeWork's Valuation ...............18

        A.     Neumann and SoftBank "Come Up With a Solution Together" ...................18

        B.     Neumann and SoftBank Execute Their Scheme to Raise WeWork's Valuation ..........19

        C.     Neumann's and SoftBank's Scheme Raises WeWork's Valuation from $20 Billion to $47 Billion – a New Baseline for WeWork's IPO Price ...............20

VII.    Neumann Grants Interviews to *CNBC* While in California in Furtherance of His and SoftBank's Scheme to Inflate WeWork's Valuation .................................22

        A.     Neumann Falsely States that WeWork Has "Above and Beyond" All the Cash It Needs "for the Next Four to Five Years" ..................................22

**Page**

B.    Neumann Falsely Touts the Strength of WeWork's Business Model,
Knowing WeWork Was Running Out of Money Quickly.....................................24

C.    Neumann Hypes WeWork's Prospects Before 10,000 Employees in Los
Angeles in January 2019, as He Had on Prior Occasions....................................26

D.    SoftBank Joins Neumann in Hyping the "Dramatic" Profitability of
WeWork's Business Model ...........................................................................27

VIII.   Additional Facts Show Scienter...................................................................................28

A.    Financial Incentives Support Scienter ...............................................................28

B.    Self-Dealing and Corporate Governance Failures Support Scienter ...................29

IX.   Loss Causation and Plaintiffs' Economic Damages .........................................................30

CLASS ACTION ALLEGATIONS ......................................................................................36

COUNT I .............................................................................................................................37

COUNT II ............................................................................................................................38

COUNT III ...........................................................................................................................38

PRAYER FOR RELIEF .......................................................................................................39

JURY DEMAND ..................................................................................................................39

Plaintiffs Malakyar Vernet and Henriette Kockum ("plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to plaintiffs and plaintiffs' own acts and upon an investigation conducted by and through counsel, which included, among other things, a review of The We Company's ("WeWork" or the "Company") financial records and investor presentations; financial analysis, media reports and releases by and about WeWork; and filings in litigation involving WeWork.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This is a class action on behalf of those who purchased any WeWork securities between June 3, 2016 and September 30, 2019 (the "Class Period") against WeWork, a former executive, and a controlling shareholder for violations of California Corporations Code §§25400(d), 25401, 25500, 25501, and 25504.

2.     WeWork is a private commercial real estate company that specializes in the provision of shared workspace for technology startups and other enterprises.  Founded in 2010 by defendant Adam Neumann ("Neumann"), his wife Rebekah Neumann, and Miguel McKelvey, the Company maintained dual headquarters in San Francisco and New York City.

3.     WeWork leases office space in commercial buildings, usually under longer contract terms (averaging 15 years) and then subleases these spaces at higher prices to subtenant businesses on shorter, more flexible contract terms.  The Company designs and refurbishes these spaces in order to foster a sense of shared office "community" within the Company's brand aesthetics.  During the Class Period, WeWork offices became renowned for offering amenities such as free beer, baristas, foosball tables, and other communal perks.  In addition to charging tenants a premium for contract flexibility and the Company's trademark amenities, WeWork attempts to generate higher revenues by designing spaces to allow for more workers within the same office footprint.

4.     Defendant Neumann, WeWork's former Chairman and Chief Executive Officer ("CEO"), served as the Company's primary brand ambassador and driving creative force.  According to defendant Neumann and the other defendants, WeWork was far more than a commercial real

estate company.  Rather, the Company's technological and data-focused approach to designing communal office spaces purportedly offered a transformational reordering of the way people work and interact.  WeWork claimed it offered a "physical social network," with a mission "to elevate the world's consciousness," providing its members not only "with flexible access to beautiful spaces," but also "a culture of inclusivity and the energy of an inspired community, all connected by [the Company's] extensive technology infrastructure."  WeWork, defendants claimed, had "the power to elevate how people work, live and grow."[1]

5.     Defendants relied on this carefully-curated image as well as its repeated representations that WeWork was growing at a breakneck pace to successfully attract investors.  And by 2017, WeWork landed the biggest investor in the industry – defendant Softbank Group Corp. ("Softbank") and its CEO, Masayoshi Son ("Son").  Son famously decided to invest more than $4 billion in WeWork after meeting with Neumann for less than an hour.  But this bargain came with a catch – Neumann had to grow WeWork at all costs – Son told Neumann that he was not "crazy enough" in pursuing growth.  Son kept this pressure on Neumann, driving him to make reckless business decisions by, among other things, pushing WeWork to grow 25 times bigger in just five years.  In this context, members of WeWork's leasing deal team at the core of WeWork's business reportedly had "nervous breakdowns" in an effort to close as many lease deals as possible.  With the knowledge and at the direction of WeWork senior management, they resorted to fabricating lease underwriting metrics to get as many deals done as quickly as possible.  These and other practices underlay a business that was doomed.

6.     By January 2019, with revenues buoyed by WeWork's improper leasing and accounting gimmicks, the Company's valuation ballooned to $47 billion, making it one of the most highly valued private startups in the world.  But that $47 billion also was illusory – Neumann along with SoftBank deployed a manipulative device in the form of an unfunded warrant to conjure that $47 billion out of thin air.  Days after details of that January 2019 arrangement became public, Neumann granted an interview to *CNBC* while he was in Los Angeles to tout the deal in advance of

---

[1]     The We Co., Registration Statement (Form S-1), at 6 (Aug. 14, 2019).

WeWork's planned initial public offering ("IPO").   In doing so, Neumann told *CNBC* that WeWork's deal with SoftBank was a "spectacular achievement."  "But more importantly, it's above and beyond what we need to fund the company for the next four to five years," Neumann stated, to justify WeWork's $27 billion valuation increase.[2]

7.     Nothing could have been further from the truth.  WeWork was running out of money quickly.   The speed of the decline was driven, in substantial part, by WeWork's fabricated underwriting metrics because that practice had generated unprofitable leases.  Indeed, WeWork's business model consumed capital with such great velocity to fuel its purported meteoric growth that by October 2019 – just nine months after Neumann said WeWork had enough funds for four or five years – the Company had just "***two weeks***" before it would run out of money altogether.[3]  Facts revealing WeWork's insolvency emerged in a torrent of scrutiny that WeWork's draft August 14, 2019 IPO prospectus unleashed.   In its review process, the U.S. Securities and Exchange Commission ("SEC") rejected the prospectus as misleading for a number of reasons.  Additional disclosures required by the SEC further exposed the Company's precarious finances and rampant insider dealing.  Biting exposés by investigative journalists and industry analysts revealed even more details about the Company's inner workings, including that WeWork had grown with reckless abandon and squandered investor money on Neumann's personal pet projects without any business rationale and oftentimes simply to serve his lavish lifestyle.  One reporter described WeWork as a "monetary bonfire."

8.     In the face of these revelations, from August 2019 onward, the value of WeWork securities plummeted.  On September 30, 2019, the Company officially pulled the plug on its IPO in what was described as "one of the most spectacular flameouts in recent corporate history."[4]  By November 2019, WeWork was valued at less than $5 billion.  But even that price had been inflated

---

[2]    CNBC, *Full Interview with Ashton Kutcher and WeWork CEO Adam Neumann*, CNBC.com (Jan. 10, 2019), https://www.cnbc.com/video/2019/01/14/watch-cnbcs-full-interview-with-ashton-kutcher-and-wework-ceo-adam-neumann.html (hereinafter "*CNBC Jan. 10, 2019 Interview*").

[3]    Emphasis is added throughout unless otherwise noted.

[4]    Gabriel Sherman, *The Boy Who Cried Work*, Vanity Fair, Holiday 2019/2020, at 126.

1   by defendant SoftBank in order to limit the amount of losses that SoftBank would need to report to

2   its own investors.  Meanwhile, bonds that WeWork sold in April 2018 for $700 million have traded

3   at less than 35 cents on the dollar and still trade at a large discount.

4          9.     By contrast, defendant Neumann received one of the most lavish golden parachutes of

5   all time despite the wreckage he had wrought: a buyout package valued at the time at $1.7 billion.

6         10.    Even WeWork admits that SoftBank bears responsibility for inflating WeWork's

7   stock value on the back of reckless growth that pushed WeWork to the brink of bankruptcy.

8   WeWork states as much in its court filings: "SoftBank was far from blameless in the Company's

9   failed IPO and subsequent financial challenges.  As SoftBank deepened its investment in the

10   Company, it pressed for the Company to grow at all costs," and, quoting *The New York Times*,

11   WeWork stated that SoftBank "'poisoned the ecosystem for young companies by encouraging

12   founders to take excessive risks with little regard for building businesses that can last through the

13   ups and downs of the economy.'"[5]

14         11.    Plaintiffs and members of the Class (as defined below) have suffered significant

15   losses as a result of defendants' violations of the California Corporations Code as detailed herein.

16   This lawsuit seeks recompense for those losses.

17                        **JURISDICTION AND VENUE**

18         12.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332, as

19   this is a class action where at least one of the members of the Class is a citizen of a state different

20   from at least one of the defendants, and the matter in controversy exceeds the sum or value of

21   $5,000,000.

22         13.    Venue is proper in this judicial district under 28 U.S.C. §1391, because, as discussed

23   herein, a substantial part of the events or omissions giving rise to the claims occurred in this District.

24   These events include, but are not limited to, the planning and execution of a transaction that

25   defendants designed to spuriously inflate the value of WeWork's securities during the Class Period.

26   *See infra* §§V, VI; *see also* ¶¶18-22.

27   _____

28   [5]   Verified Cpt., *The We Co. v. Softbank Grp. Corp., et al.*, No. 2020-0258, 2020 WL 1820688 (Del. Ch. Apr. 7, 2020), at ¶34.

**THE PARTIES AND KEY NON-PARTIES**

14.     On April 30, 2019, plaintiff Malakyar Vernet purchased shares of WeWork Class A common stock at inflated prices and was damaged thereby.

15.     On January 26, 2019, plaintiff Henriette Kockum purchased shares of WeWork Class A common stock at inflated prices and was damaged thereby.

16.     Defendant WeWork is a real estate and office-sharing company.  The Company is headquartered in New York City but maintained dual headquarters in San Francisco starting in late 2018.  WeWork's CEO during the Class Period, defendant Neumann, resided in California, made misstatements in California, and executed a transaction in California that manipulated WeWork's stock prices during the Class Period.  *See infra*. §§V, VI; *see also* ¶¶18-22.

17.     Defendant Neumann is the co-founder and former Chairman and CEO of WeWork. Neumann also maintained voting control over the Company through his ownership of Class A, Class B, and Class C WeWork stock and exercised complete control over, and power to replace members of, WeWork's Board of Directors (the "Board").

18.     Defendant Softbank started investing in WeWork in 2017.  SoftBank's CEO is Son. Son created a $100 billion venture capital fund (called the "Vision Fund") that invested in WeWork at Son's behest.  Son started the Vision Fund in 2017 to invest in technology companies, including a number in Silicon Valley.  *Fast Company* has written that the fund made Son the most powerful person in Silicon Valley.

19.     Son's Vision Fund was larger at inception than the entire amount of venture capital invested annually and dwarfed any single fund in Silicon Valley.  Senior partners of a venture capital fund – a fund that has a seat on WeWork's Board – have witnessed SoftBank deploy capital in harmful ways.  The relevant entity behind that venture capital fund is non-party Benchmark Capital Management Co. VII, L.L.C. ("Benchmark"), an investment company headquartered in Woodside, California.  Benchmark manages a number of entities that invested in WeWork, while non-parties J. William Gurley ("Gurley") and Bruce Dunlevie ("Dunlevie") are directors of Benchmark and reside in the San Francisco Bay Area.  Benchmark appointed Dunlevie to the WeWork Board in

2012, and he has served in that role into 2020.[6]  Dunlevie's partner, Gurley, told *CNBC* that SoftBank uses "capital as a weapon" and that it was difficult to work on boards with them.[7]  "'If you're on the boards of these companies [with SoftBank], choosing not to engage is ceding the field,' Gurley said.  'So I think it's one of the toughest things a board has ever had to analyze.  Any board in the history of business, no one's faced this.'"  *Id.*  Non-parties Benchmark, Dunlevie and Gurley are material witnesses to key events at issue in this case, including the January 2019 warrant transaction at issue (*see infra* §§V-VI); Son's relevant dealings with Neumann; and Son/SoftBank's control over the various investment entities (including the Vision Fund) that they used to inflate WeWork's stock price.

20.     Indeed, Son and executives under his control run both Softbank and the Vision Fund, as WeWork admits in court filings.  These facts are consistent with reports based on interviews with Softbank and Vision Fund executives.  *Fast Company* issued one such report, explaining that Son's investment "machinations have always been highly complex"; but, "regardless of the means, the deals are at *his behest*."[8]  As a result of Son's investment activities in WeWork, SoftBank and the Vision Fund were able to designate a Board member (Ron Fisher) during the Class Period. SoftBank and the Vision Fund frequently make parallel investments: here, the Vision Fund bought 8.9% of WeWork's stock; SoftBank owns 43.4%.

21.     Son's WeWork investment machinery is present in California.  There are many examples.  The Vision Fund has about a dozen managing partners who meet on a weekly basis to discuss the fund's business: three of these managing partners reside in the San Francisco Bay Area. Another partner of the Vision Fund, Kirthiga Reddy, is also employed by a Softbank affiliate; resides in the San Francisco Bay Area; and was designated by SoftBank to sit on WeWork's Board of

---

[6]     Declaration of Bruce Dunlevie in Support of Plaintiff's Motion for the Entry of a Status Quo Order, *The We Co. v. Softbank Grp. Corp., et al*., No. 2020-0258 (Del. Ch. May 22, 2020), at ¶1.

[7]     Lauren Feiner, *Softbank uses 'capital as a weapon' and competitors don't know how to react, says legendary tech investor Bill Gurley*, CNBC (Sept. 11, 2019), https://www.cnbc.com/2019/09/10/softbank-uses-capital-as-a-weapon-benchmark-vc-bill-gurley-says.html.

[8]     Katrina Brooker, *The Most Powerful Person in Silicon Valley*, Fast Company, at 2 (Jan. 14, 2019), https://www.fastcompany.com/90285552/the-most-powerful-person-in-silicon-valley.

Directors.  The Vision Fund maintains a main office (one of three total) in San Carlos, California.  The Vision Fund's Bay Area office is not far from Son's home in Woodside, California, which he purchased in 2013 for $117 million and still maintains.  Further, one of the individuals responsible for overseeing the SoftBank/Vision Fund investment in WeWork is Rob Townsend ("Townsend"), an attorney who resides in the San Francisco Bay Area and serves as SoftBank's Chief Legal Officer.  Son said that Townsend had been an adviser for years before working for SoftBank full time starting in 2018.  Son stated at the time that "[w]e are very pleased [Townsend] has agreed to join SoftBank as we transition the company into a leading global investment firm focused on the technologies that will drive the next phase of the information revolution."[9]  Townsend aids Son in running the WeWork investment and reports directly to Son.

22.     Many other examples show that Son used California resources under his effective control to execute and manage the SoftBank/Vision Fund investments in WeWork.  To cite a few, Chad Fentress is SoftBank's Chief Compliance Officer, resides in the San Francisco Bay Area, works for a SoftBank affiliate and was designated by SoftBank to serve on WeWork's Board of Directors.  SoftBank has other employees responsible for managing Softbank and the Vision Fund's investment in WeWork and who work and reside in the San Francisco Bay Area.  A SoftBank affiliate responsible for managing Softbank and the Vision Fund's investment in WeWork is headquartered in San Carlos, California.  Other affiliates maintain SoftBank's WeWork investment records in the San Francisco Bay Area.

23.     Each of the defendants is liable for making false or misleading statements, aiding and abetting one another, and/or willfully participating in acts that damaged Class members in violation of California law.

---

[9]   *Robert Townsend to Join Softbank Group as Chief Legal Officer and Senior Vice President*, Business Wire (Aug. 14, 2018), https://www.businesswire.com/news/home/20180813005705/en/Robert-Townsend%C2%A0to-Join-SoftBank-Group-Chief-Legal.

**FACTUAL ALLEGATIONS**

**I.      The Rise of WeWork**

24.      WeWork is a real estate and workspace sharing company.  Founded in 2010 by defendant Neumann, his wife Rebekah Neumann, and Miguel McKelvey, the Company opened its first facility in New York City, offering shared workspace and services to entrepreneurs, freelancers, startups, and small businesses.  The Company distinguished itself by its focus on developing perk-filled shared workspaces intended to foster a sense of collaboration and community.

25.      Defendant Neumann became the public face of the Company.  He led with striking personal charisma, engendering admiration both within and outside the Company for his apparent entrepreneurial vision.  He was prone to opining on grand ideas like ending world hunger or figuring out ways to "solve the problem of children without parents."[10]  He hosted lavish "summer camps" in which thousands of WeWork employees gathered in an annual music-festival-like atmosphere and engaged in activities meant to foster mindfulness, camaraderie, and progressive ideals while being entertained by popular musicians like Bastille and Alesso.  As defendant Neumann boldly proclaimed, "We are here in order to change the world.  Nothing less than that interests me."[11]

26.      WeWork grew quickly.  By 2012, the Company had four locations in New York City as well as facilities in Los Angeles and San Francisco.  In 2014, WeWork opened two co-working facilities in Washington, D.C., another in Seattle and its first international location in London.  By the end of 2015, WeWork had 54 co-working facilities in New York City, Boston, Philadelphia, Washington, D.C., Miami, Chicago, Austin, Berkeley, San Francisco, Los Angeles, Portland, and Seattle.  The Company's international locations also expanded to Tel Aviv and Herzliya in Israel.

---

[10]   Eliot Brown, *How Adam Neumann's Over-the-Top Style Built WeWork: 'This is Not the Way Everybody Behaves,'* The Wall Street Journal (Sept. 18, 2019), https://www.wsj.com/articles/this-is-not-the-way-everybody-behaves-how-adam-neumanns-over-the-top-style-built-wework-11568823827.

[11]   Reeves Wiedeman, *The I in We: How did WeWork's Adam Neumann turn office space with "community" into a $47 billion company? Not by sharing*, New York Magazine (June 10, 2019), https://nymag.com/intelligencer/2019/06/wework-adam-neumann.html.

27.     In 2017, WeWork opened a 2,200 seat community workspace in Bangalore, India, and debuted in Tokyo with 20 work facilities.  Since then, the Company has continued to expand its real estate footprint at a rapid rate, as illustrated below:[12]



28.     In addition to expanding in size, the mission of WeWork and its ambitious CEO broadened in scope.  Defendant Neumann had long claimed that WeWork should be viewed more as a tech startup that would revolutionize all aspects of life by connecting people and fostering a shared sense of purpose.  He emphasized WeWork's data capabilities, empowering innovative product development that increased members' productivity, happiness, and success and offered a model that could be applied to various human endeavors.

29.     As WeWork expanded, defendant Neumann and other WeWork executives misrepresented that Company-wide profitability was just around the corner.  For example, a 2014 presentation for investors projected the Company would turn a $4.2 million operating profit for the year.  A slide with the headline "Proven, profitable business model" claimed that "WeWork locations operate . . . with average margins of greater than 40%."[13]  Similarly, WeWork provided information to widely circulated publications to demonstrate that purported profitability of the

[12]   Erik Devaney, *How WeWork Grew into the Second Most Valuable Private Company in the US: 4 Key Secrets*, Drift.com (May 2, 2019), https://www.drift.com/blog/wework-billion-dollar-growth/.

[13]   Pitch Deck, WeWork (Oct. 2014) at 10.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE - 4:20-cv-03686-HSG                                                                                      - 9 -

Company's core business.   A 2014 *Forbes* article, citing information provided by defendant Neumann, stated that: "By February 2010, just one month after launch, WeWork turned its first profit and has never stopped."[14]   Neumann made similar misstatements during the Class Period or immediately before it commenced.

30.     In or about early June 2016, for example, Neumann convened an all-hands meeting of employees to address news reports that some of WeWork's peers were facing financial difficulties and reducing staff.   Neumann assured them all:[15]

> As opposed to other companies that you're reading about, we don't have any issues, we don't need to raise any more money.   We're in an amazing place.   *We have a profitable business that's going to only get better, that's going to help us fulfill our calling and our mission*.   By shifting this culture, we're going to be able to not only keep doing these things, but do them 10 times better, move very strongly into positive cash flow; no need to rely on raising money, no need to rely on going public, no need to rely on anything except for ourselves and fulfill our mission for our members.   We're going to do it, all of us together.

This statement was false or misleading and was made for the purpose of inducing potential investors to buy WeWork's stock at inflated prices.   *The Wall Street Journal* reviewed internal WeWork documents showing the Company had only one profitable year in its history – 2012, when it made about $1.7 million in net profits.   WeWork had over $400 million in net losses in 2016.   It would be absurd to suggest Neumann did not know that his own business was not profitable at the time he stated that the business was profitable.   Neumann continued to inflate WeWork's apparent value throughout the Class Period to induce investors to invest in WeWork.

31.     With the active involvement of defendant Softbank, the private valuation for WeWork almost tripled from about $16 billion in 2016 to $47 billion by January 2019, during which time WeWork sold stock and bonds at inflated prices.   In addition to outside equity investors, WeWork induced its own employees to buy stock that appeared to be growing in value thanks to these spurious valuations.   WeWork also sold $700 million worth of debt securities to investors in April 2018 at inflated prices.

---

[14]   Alex Konrad, *Inside the Phenomenal Rise of WeWork*, Forbes.com (Nov. 5, 2014), https://www.forbes.com/sites/alexkonrad/2014/11/05/the-rise-of-wework/#16bebf276f8b.

[15]   Foundering, *Episode 5: The Universe Does Not Allow Waste* (July 16, 2020) (Available on Apple Podcasts) (quoting Neumann).

32.     By May 2019, WeWork had the highest valuation of any startup in the United States, ahead of Juul, SpaceX and Airbnb.  As *Business Insider* reported on May 29, 2019:[16]

> With major companies like Uber, Lyft and Pinterest going public, there's a new cast of major tech startups that have taken the top spots of most highly valued private companies, PitchBook reports.  But recent major investments into burgeoning tech startups – including Juul and Pokémon Go-creator Niantic – have brought new players into the spotlight.  At this point, there are almost too many billion-dollar startups to count.
>
> The We Company's $47 billion valuation solidifies the company's spot at the top.

## II.     SoftBank Tells Neumann He Is Not "Crazy Enough" in Pursuing Growth

33.     Son, SoftBank's CEO, is an important figure in WeWork's rise in value to $47 billion and stunning collapse to values more closely approximating its true value of $0, as reflected by the fact that the Company almost ran out of funds in October 2019.  Neumann and the media sometimes refer to Son as "Masa."

34.     Masa first approached Neumann about investing in WeWork in 2017.  Neumann has described the meeting to the press.  He said that "Masa arrives, looks at his watch and tells me, 'I'm so sorry, but I only have 12 minutes.'"  Neumann was going to present a pitch deck to Son, but Son told him to put it away.  "Even today, I still get goose bumps thinking about it," Neumann recalled, noting that "[h]alf an hour later, he emails me" a term sheet for $4.4 billion in funding.[17]

35.     At the closing of that transaction in March 2017, according to Neumann, "Masa turns to me and asks, 'In a fight, who wins – the smart guy or the crazy guy?' [and] I say, 'Crazy guy,' and he looks at me and says, 'You are correct, but you and [your co-founder] are not crazy enough.'"[18]

---

[16]   Paige Leskin, *The 26 most valuable private tech companies in the U.S.*, Business Insider (May 29, 2019), https://www.businessinsider.com/most-valuable-private-us-startups-2018-10.

[17]   Steven Bertoni, *WeWork's $20 Billion Office Party: The Crazy Bet That Could Change How The World Does Business*, Forbes, at 2 (Oct. 2, 2017), https://www.forbes.com/sites/stevenbertoni/2017/10/02/the-way-we-work/#6ce7f141b181.

[18]   *Id.*  Neumann's account of his interactions with Son are consistent with that of another former WeWork executive, who noted: "You've got a guy [Son] who meets Adam for 10 minutes and cuts him a check for $4.4 billion, and it's just insane," a former WeWork executive said.  "And he's not told, 'I need you to be the most careful steward of this capital.'  It's like, 'I need you to go crazier, faster, bigger and more.'"  Amy Chozick, *Adam Neumann and the Art of Failing Up*, N.Y. Times (Nov. 2, 2019), https://www.nytimes.com/2019/11/02/business/adam-neumann-wework-exit-package.html.

36.     Son continued to press Neumann to grow at all costs in California and elsewhere. Neumann admits the importance of their face-to-face discussions: "So if I have something I need to change or talk about or he has something he needs to talk about, we call each other, but we actually prefer face-to-face meetings.  So we set up face-to-face meetings.  He comes towards us.  We go towards him [or] [w]e meet in between."[19]

37.     Growth at all costs was a common theme in the meetings between the two.  WeWork has admitted in a court filing that Softbank (again, run by Son) "pressed for the Company to grow *at all costs*."[20]  Neumann has admitted the same thing.  He said that Son would come to him and exclaim, "'Woah, woah, woah; wait.  Why only [aim for] a million members when you can have five?'"  "Every single number we had" at WeWork was "too small."[21]

### III.     SoftBank Urges WeWork to Grow 25 Times Bigger

38.     Reckless growth also underlay business proposals that SoftBank made to Neumann in 2018.  In mid-2018, for example, Son told Neumann that if the Company increased its revenues from $2 billion to $50 billion in five years, then Neumann could increase his ownership share of the Company from 37% to over 50%.  WeWork's court filings provide additional context: in "mid-2018, SoftBank and WeWork's then-CEO Neumann proposed a buyout of WeWork's outside stockholders that would make them the primary co-owners of WeWork."[22]

39.     Neumann was thus pressured by SoftBank to grow revenue 25 times larger in just five years, while also being told that SoftBank would give him over half the Company's equity in return. Neumann told senior executives around this time to grow at all costs, stating, for example: "We're

---

[19]  *CNBC Jan. 10, 2019 Interview*, *supra*.

[20]  *The We Co.*, 2020 WL 1820688, at ¶34.

[21]  Eric Platt & Andrew Edgecliffe-Johnson, *WeWork: how the ultimate unicorn lost its billions*, Financial Times Magazine, at 10 (Feb. 19, 2020), https://www.ft.com/content/7938752a-52a7-11ea-90ad-25e377c0ee1f.

[22]  *The We Co.*, 2020 WL 1820688, at ¶31.

1  not going fast enough; we're not being bold enough."[23]  And Neumann raised internal growth targets

2  again even as the Company's Real Estate Deal team was struggling to keep up.

3     40.    SoftBank's and Neumann's pressure to raise revenue by a factor of 25 negatively

4  impacted the Company's core business – lease underwriting.

5  **IV.    WeWork's Business Model Breaks Under Growth Pressure**

6     **A.    Lease Underwriting Was Core to WeWork's Business**

7     41.    Lease underwriting is at the core of WeWork's business model, as WeWork admits:

8  "Sourcing, underwriting and signing a new space is the starting point of the lifecycle of a location."[24]

9  The underwriting process is essential to the business model because it determines the amount of

10  money that the Company can make from its customers at the particular leasing location under

11  consideration.  Consequently, the underwriting process determines whether WeWork will be able to

12  make a profit at the location after accounting for expenses.

13     42.    WeWork prepared a slide to illustrate the relationship amongst these concepts in

14  relation to underwriting.   After a slide titled "Our Business Model," WeWork presented this

15  illustration:[25]

16  ## Our core business model generates strong unit economics



25

<hr/>

26  [23]  Platt, et al., *supra* at 10.

27  [24]  Form S-1, *supra* at 182.

28  [25]  The We Co., *WeWork Investor Presentation*, at 16 (Oct. 11, 2019).

1    All four of these "core business" components are at the heart of sound lease underwriting.

2           **B.      Lease Underwriting Was WeWork's "Single Biggest" Growth Driver**

3           43.    Lease underwriting, in turn, drove the growth of the Company.  WeWork's Head of

4    Product Systems and Operations explained this point to an industry publication.  He said that the

5    "single biggest blocker to our ability to expand *is plainly and simply how many leases* we can

6    sign."[26]  The faster WeWork signed leases, the faster it would grow.

7           44.    Sound lease underwriting should, in principle, grow in importance along with the

8    number of leases that WeWork signed.  One Company insider explained why: "It was harder,

9    significantly harder to go from 500 to 1,000 than from 100 to 200, just the amount of moving parts

10   and pieces, because there's only so much available real estate in a given market," concluding that "it

11   was just a lot of things that got like exponentially harder as you got bigger and as you tried to keep

12   doubling."[27]  Between 2015 and 2019, WeWork's leased locations ballooned from approximately 52

13   in 2015 to about 551 – over tenfold.

14          **C.      WeWork Fabricates Lease Underwriting Metrics to Fuel Growth**

15          45.    Unfortunately, WeWork's senior management directed executives to fabricate lease

16   underwriting metrics on a systematic basis to achieve WeWork's financial and operating growth

17   targets.  This conduct was ongoing by summer 2018.  The subject of manipulating lease

18   underwriting metrics arose regularly at weekly Real Estate Deal team meetings.  Chief Operating

19   Officer ("COO") Arik Benzino at times attended these meetings.  Co-Head of Real Estate Arash

20   Gohari ("Gohari") also attended the meetings and pushed for the fabrication of underwriting metrics.

21   Gohari harshly criticized any opposition to the fabrication practice.

22          46.    By at least summer 2018, key aspects of underwriting WeWork's real estate portfolio

23   were manipulated to match pre-determined operational and financial targets.  Among the operational

24   targets that drove the underwriting manipulation were that: (1) locations would reach a "payback

25

26   [26]   Lydia Belanger, *Here's How WeWork Pinpoints the Perfect Locations for Its Co-Working Spaces in Neighborhoods*, Entrepreneur.com (Sept. 25, 2017), https://www.entrepreneur.com/article/300677.

27   [27]   Foundering, *Episode 5*, *supra* (quoting Dave Defano).

28

period" within six to twelve months; (2) properties would achieve an investment return rate in the mid-teens; and (3) properties would provide a cash-on-cash return.

47. Executives engaged in a number of fraudulent underwriting practices to meet these targets. For example, the Company commonly added more desks to a location than the location could ever support (because of design or other reasons) in order to inflate projected revenues from the location. Similarly, the Company would materially underestimate construction costs and overstate projected revenues from tenants to match earnings and cash flow targets.[28] This caused WeWork to suffer tremendous losses when properties failed to perform as underwritten.

48. The Company also employed a deal process reporting system that required WeWork's Real Estate Deal team members to make presentations at the weekly deal team meetings. These meetings occurred as WeWork pursued lease growth.

49. Neumann was responsible for setting the unachievable growth targets.[29] "There was enormous pressure" to sign leases as a result – as a WeWork employee put it – "[p]eople were having nervous breakdowns trying to sign new space." *Id.* at 13. WeWork employees thus "became ridiculously aggressive" to sign leases by any means. *Id.*

**D.    WeWork Designs Earnings Systems to Obfuscate the Business's True Value**

50. Because WeWork systematically signed unprofitable leases on the basis of spurious underwriting practices at least from summer 2018 onward, the Company also developed an overly complex system for calculating earnings that was designed to obfuscate – and did obfuscate – the true investment profile of its properties. Because Real Estate Deal team members were given an

---

[28]    As an example of how the Real Estate Deal team would make these numbers up, the Company may project that construction and build-out costs would only be $100 per square foot when, in reality, they would cost $200 per square foot. Similarly, the underwriting may state that the tenant would pay $60 per square foot but, in reality, WeWork would enter into deals that would only require tenants to pay $40 per square foot. Likewise, WeWork would cut deals with tenants – in particular, startups owned by friends of Neumann – where they would grant these tenants rents far below the underwritten rate. In addition, WeWork would underwrite properties based on projected rental rates of two or three times the market rate even though such rates were not reasonably achievable.

[29]    Platt, et al., *supra* at 12 ("Neumann had raised internal growth targets the previous year, but the real-estate team was struggling to keep up.").

1   "open checkbook" to procure properties, no one cared about investment returns or potential losses.

2   Rather, Real Estate Deal team members were encouraged to procure as much real estate as possible

3   even if a deal did not make economic sense.

4        51.     One employee who had worked on the Real Estate Deal team would later note at an

5   all-hands meeting that "we've made some decisions for the sake of speed" while asking, after the

6   Company was on the verge of running out of cash in October 2019 (and after Neumann's ouster),

7   whether the Company should start making "adult decisions even when they're not fun for the sake of

8   profitability and expansion?"[30]   The senior executive who responded to that question laid the blame

9   for the real estate leasing decisions at Neumann's feet and said the Company needed to change:

10   "We're going to switch from this being a ***one-man show that made every decision*** to actually having

11   a model where leaders are empowered."  *Id.* at 21.   That one man was Neumann.

12   **V.   SoftBank's and Neumann's $15 Billion "Project Fortitude" Deal Aims to
   Take Control of WeWork in Advance of Its Initial Public Offering**

13        **A.   Neumann and SoftBank Meet in California**

14        52.     In an effort to further consolidate their control over WeWork before its planned IPO,

15   in mid-2018 SoftBank and Neumann orchestrated a transaction to buy out the Company's outside

16   stockholders.   They called the proposed transaction "Project Fortitude."  "For months" leading up to

17   December 2018, "SoftBank and Son assured WeWork's executive team and Board that it intended to

18   consummate that transaction."[31]   These assurances went to Neumann because, as SoftBank

19   representatives have put it, during this time WeWork was a "one-man show that made every

20   decision," referring to Neumann.[32]   Neumann reportedly was living at his home in Corte Madera,

21   California during this period of time – at least part of winter 2018 and into early 2019 – when,

22   reportedly, "Son would stop by Mr. Neumann's Corte Madera, California, mansion, which featured a

---

[30]   Shirin Ghaffary, *Leaked transcript: Read what WeWork's new chairman told anxious employees at an all-hands meeting*, Vox.com, at 20 (Oct. 24, 2019), https://www.vox.com/2019/10/24/20929236/wework-layoffs-adam-neumann-marcelo-claure.

[31]   *The We Co.*, 2020 WL 1820688, at ¶31.

[32]   Ghaffary, *supra* at 21.

1    guitar-shaped living room."[33]  These facts are consistent with reports that Neumann, in turn, would

2    visit Son at his estate in Woodside, California, and Neumann's own admissions that he and Son

3    preferred to discuss business "face-to-face."[34]

4         53.    Son would also meet with his SoftBank/Vision Fund team in San Carlos, California in

5    September or October 2018.  These events occurred contemporaneously with reports by *The Wall*

6    *Street Journal* about Project Fortitude "people familiar with the discussions" disclosed to reporters

7    that SoftBank/Vision Fund were in discussions to make a $15-20 billion Project Fortitude

8    investment in WeWork.[35]  These facts show Son was working on Project Fortitude while in

9    California, which makes sense because that is where key investment operations were located.  *See*

10   ¶¶18-22.

11       **B.    SoftBank's Due Diligence on WeWork's Operations**

12        54.    SoftBank conducted due diligence on the $15-$20 billion Project Fortitude deal with

13   WeWork from its San Francisco Bay Area offices during October-December 2018.  WeWork admits

14   in court filings that SoftBank "would have undertaken extensive diligence on WeWork" during this

15   period.[36]  One of the Vision Fund's San Francisco Bay Area managing partners has explained that its

16   due diligence process is detailed.  The Vision Fund "does a lot more diligence" than other funds

17

18   _____

     [33]  Chozick, *supra*.

19
20   [34]  *Id*.; *CNBC Jan. 10, 2019 Interview*, *supra*.  Neumann conducted significant WeWork business in
     California during this time.  In 2018, Neumann began laying the groundwork for opening a dual
21   corporate headquarters in San Francisco to support its rapid expansion in California.  In May 2018,
     Neumann met with the mayor of Los Angeles about WeWork's activities in that city and made a
22   presentation at a public event in San Francisco, where he touted the Company's growth and the fact
     that a property in San Francisco was one of the first two properties that WeWork had leased.
23   WeWork's rapid leasing expansion comprised approximately 31 properties in Los Angeles and 19
     properties in San Francisco in 2018.  In December 2018, WeWork opened a second headquarters in
24   the Salesforce Tower in San Francisco.  By January 2019, Neumann resided in California: Vanity
     Fair reported that in "January [2019], the Neumanns relocated to their mansion in Corte Madera, just
25   across the Golden Gate Bridge from San Francisco. They brought their household staff and a teacher
     from WeGrow with them and planned to spend two months on the West Coast as Neumann hunted
26   for deals."  Sherman, *supra* at 126.

     [35]  Eliot Brown, Dana Mattioli, & Maureen Farrell, *Softbank Explores Acquiring Majority Stake in*
27   *WeWork*, The Wall Street Journal, Oct. 10, 2018, at A1.

28   [36]  *The We Co*., 2020 WL 1820688, at ¶32.

     CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS
     CODE - 4:20-cv-03686-HSG                                                          - 17 -

when it makes investments in the hundreds of millions of dollars.[37]  The Vision Fund compares its due diligence process to that of a private equity investor considering buying an entire company in one transaction.  The process is detailed for investments and involves "jumping in the company."  *Id.*

55.   The Vision Fund's due diligence process takes approximately 12 weeks to complete and "takes a village" to execute.   It includes a managing partner, four or five investment professionals, tax professionals, audit professionals, and legal professionals, as well as compliance and risk professionals.   This is the process the Vision Fund would follow in evaluating a $100 *million* investment.  By comparison, Project Fortitude was a $15-$20 *billion* prospect.

56.   SoftBank's due diligence on WeWork over the October-December 2018 timeframe necessarily would have uncovered the fact that WeWork had been fabricating lease underwriting metrics to close deals and meet Neumann's and Son's growth targets.   WeWork itself admits that SoftBank "would have undertaken extensive diligence" during this time and was "fully informed about the Company and its financial condition" by January 2019.  Elsewhere, Softbank admitted it was able to conduct an "audit" of WeWork as part of the process it followed to value WeWork.[38]

## VI.   SoftBank and Neumann Create a New Device to Inflate WeWork's Valuation

### A.   Neumann and SoftBank "Come Up With a Solution Together"

57.   With its Project Fortitude due diligence process complete, or nearly so, in December 2018, SoftBank abandoned its plans to spend $10-$15 billion on WeWork – no doubt in substantial part because of its due diligence findings over the preceding months.

58.   That same month, WeWork filed draft offering documents with the SEC to begin its IPO process.   The filing was not public at the time, but SoftBank knew about the filing given its discussions with Neumann and the fact that SoftBank had at least one representative on WeWork's Board.

---

[37]   This Week in Startups, *Softbank Managing Partner Jeff Housenbold on Deploying the $100B Vision Fund, Getting Recruited by Masayoshi Son, Counseling Founders to Manage Massive Capital, Creating Moats, Reasons for Shift Toward Profits, Lessons from WeWork & More*, ThisWeekinStartups.com (Mar. 10, 2020), https://thisweekinstartups.com/e1035-softbank-managing-partner-jeff-housenbold-on-deploying-the-100b-vision-fund-getting-recruited-by-masayoshi-son-counseling-founders-to-manage-massive-capital-creating-moats-reasons-for-shif/.

[38]   *The We Co.*, 2020 WL 1820688, at ¶32.

59.     On January 10, 2019, Neumann admitted to *CNBC* that he and Son came up with a plan that would increase WeWork's valuation to $47 billion despite the fact that SoftBank was lowering the amount of new capital it planned to invest in the Company from $15-$20 billion to $2 billion – lowering the new capital it would invest by about $14 billion in total:[39]

> *CNBC*, DEIDRE BOSA: So, confidence aside – and I would agree with you, 10 billion dollars into this company is a huge amount, a 47 billion-dollar post-money valuation. But we are talking about a potentially 14-billion-dollar shortfall. So, how has that changed your plans if at all? Are you looking to raise more money, even after this huge injection?
>
> ADAM NEUMANN: . . . Putting that aside, the interesting thing about the investment – there's a lot of rumors. And there's what happened. The most important thing is when **Masa [Masayoshi Son] called me** and said, You know, this has happened and that happened, and the world is changing. The first thing he said is, I'm calling you to share this as a partner. **And I just wanted to come up with a solution together.**
>
> And then as still partners, we talked about it and **we came up with the fact that a 6 billion dollar investment today** – you said **post-money valuation of 47 [billion]**, and I think includes a billion dollars of secondary [to] investors and employees, is **an amazing way to set a benchmark**, but just get going. And what this is really going to do, it's going to allow us to fulfill the mission a lot more than ever before.

60.     The call that Neumann mentions above reportedly occurred while Son and Neumann were both in Hawaii; after the call, they had a face-to-face meeting on the subject in Maui. Neumann flew the $60 million private jet that he bought with investors' money from the island where Neumann was surfing (presumably, Oahu) to Maui, where Son was staying, to convince him to commit another $1 billion of new capital. Neumann succeeded. Neumann then flew his private jet back to California, where he closed an additional $1.5 billion unfunded warrant deal with Son.

**B.     Neumann and SoftBank Execute Their Scheme to Raise WeWork's Valuation**

61.     Neumann closed the new warrant deal with Son while Neumann was in California, during early January 2019. On January 7, 2019, Neumann gave an interview to *Fast Company* from Neumann's Los Angeles offices discussing the warrant deal.[40] On January 8, 2019, WeWork and

---

[39]   *CNBC Jan. 10, 2019 Interview*, *supra*.

[40]   Katrina Brooker, *Exclusive: WeWork rebrands to The We Company; CEO Neumann talks about revised SoftBank round*, Fast Company (Jan. 8, 2019), https://www.fastcompany.com/90289512/exclusive-wework-to-rebrand-to-the-we-company-in-wake-of-disappointing-funding-news.

SoftBank commented on the deal's closing in a press release, touting: "WeWork's post-money valuation is now $47 billion."[41]  Other media reported, on January 8, 2019, the deal's key terms: a new $2 billion invested and $47 billion valuation.[42]

62.     That $47 billion valuation rested on a contract that Neumann and Son agreed to execute and announce while Neumann was in California and that would have required the approval of California-based Benchmark Board member Dunlevie.  *See infra* ¶19.  Specifically, the contract was a warrant by SoftBank to buy $1.5 billion in WeWork stock at $110 per share.  WeWork admits as much in court filings: "The Company's valuation [was] reported to be $47 billion in January 2019 based on the $110 per share valuation implied by the [w]arrant."[43]  WeWork describes SoftBank's motives during this time: "throughout its time as an investor in the Company, SoftBank [has] sought to advantage itself to the detriment" of all other investors.  *Id.* at ¶40.  The warrant that SoftBank wrote is consistent with this sentiment because it gave SoftBank the discretion not to buy $1.5 billion in stock from WeWork – according to SoftBank's COO Marcelo Claure ("Claure"), SoftBank was not obligated to fund the warrant even in the face of WeWork's imminent financial collapse in October 2019.[44]

### C.     Neumann's and SoftBank's Scheme Raises WeWork's Valuation from $20 Billion to $47 Billion – a New Baseline for WeWork's IPO Price

63.     The purpose of the $1.5 billion warrant was to manipulate WeWork's stock value in advance of the IPO that WeWork put into motion in December 2018 with SoftBank's knowledge and participation.  The warrant had its intended effect.  Bankers used the $47 billion valuation as a

---

[41]  *WeWork Closes $6 Billion Investment from SoftBank*, Associated Press, Jan. 8, 2019, https://apnews.com/4d6232994be146a7b52693e3e749ad2d.

[42]  David Gelles, *Softbank Makes a Big Bet on WeWork. Again.*, N.Y. Times, Jan. 8, 2019, at B3.

[43]  *The We Co.*, 2020 WL 1820688, at ¶33.

[44]  Specifically, on or about October 15, 2019, Benchmark's Board representative, Dunlevie, spoke with SoftBank's COO about the unfunded warrant.  At that time, SoftBank's COO told Dunlevie that SoftBank "had grounds to refuse to honor its obligations under the [January 2019] [w]arrant"; Dunlevie and another Board member, however, were "unaware of any legitimate grounds that could have excused SoftBank's performance of the [January 2019] [w]arrant."  *The We Co.*, 2020 WL 1820688, at ¶¶40-41.

baseline figure in pricing the Company for an IPO, as the following illustration from the *Financial Times* shows:[45]



**The rise and fall of WeWork's valuation**

$bn

Morgan Stanley
**$43bn-$104bn\***

Goldman Sachs
**$61bn-$96bn**

JPMorgan
**$46bn-$63bn**

Range

Top Wall Street banks pitched high-flying potential valuations to WeWork executives

**$8bn**
valuation since
Oct 2019

\*Based on a 2018 presentation from the investment bank
Sources: FT research; Crunchbase
© FT

64.    This illustration demonstrates how the $1.5 billion moneyless warrant caused WeWork's valuation to double virtually overnight in early January 2019.  The inflated valuation was important to SoftBank because it had invested $9 billion (excluding the warrant) at a lower valuation of $20 billion.  In other words, *if* the moneyless warrant ploy worked as a price-settling mechanism for the IPO, then SoftBank would stand to potentially double its money, notwithstanding the negative facts it no doubt learned about WeWork in conducting due diligence on the Company in the months leading up to the end of 2018.[46]  Similarly, manipulating WeWork's valuation in January

---

[45]    Platt, et al., *supra* at 3.

[46]    WeWork admits in court filings that WeWork's valuation rose to $47 billion "in January 2019 based on the $110 per share valuation implied by the [w]arrant." *The We Co.*, 2020 WL 1820688, at ¶33.  WeWork further admits that SoftBank's decision to "suddenly abandon" its plans to invest

1   2019 would allow SoftBank to avoid reporting losses to its own investors on the WeWork

2   investments that SoftBank had made through January 2019.

3   **VII.   Neumann Grants Interviews to *CNBC* While in California in Furtherance of
        His and SoftBank's Scheme to Inflate WeWork's Valuation**

4

5           **A.   Neumann Falsely States that WeWork Has "Above and Beyond" All
               the Cash It Needs "for the Next Four to Five Years"**

6           65.     Neumann continued to inflate WeWork's valuation and induce investments in

7   WeWork by touting the Company's financial strength to the financial media in Los Angeles on

8   January 10, 2019.  He gave the interview while he was in Los Angeles.[47]  The numbers that he and

9   *CNBC* discuss in the following exchange relate to the $24 billion (aggregated, $9 billion existing and

10  $15 billion in new money) that SoftBank had planned to invest in WeWork versus the purported $2

11  billion in new money that WeWork actually raised in December 2018/January 2019.  In this context,

12  Neumann falsely assured investors that the money he just raised from SoftBank would last WeWork

13  for four to five years:[48]

14          *CNBC* REPORTER: I hate to use the word disappointing, because you're right, it is
            still 10 billion dollars. . . .  But you – but that's 14 billion dollars that would have
15          gone into WeWork to let you achieve all of these enormous goals that you've set up
            for the company, particularly with your rebranding.
16
            ADAM NEUMANN: I'm going to give you a little clarity.  That 14 billion had 10
17          billion in it in secondary.

18          CNBC REPORTER: Okay.

19          ADAM NEUMANN: So secondary is not money that actually goes to fund the
            company.  It would have gone to investors and employees, actually not to me.  I'm
20          not a seller.

21          *CNBC* REPORTER: And it would have bought out all of your existing (indiscernible
            [investors]) –
22
            ADAM NEUMANN: It would have bought – without getting too much into the
23          detail, it was going secondary, which means none of it was going to the balance
            sheets.  So, actually, you have only 1 billion less than you would have had on your
24

25  $15-$20 billion in WeWork in late 2018 left WeWork "in the lurch without an alternative source of
    funding."  *Id*. at ¶31.

26  [47]   The interview occurred in Los Angeles on or about January 9, 2019 and was aired on January 10,
    2019.

27

28  [48]   *CNBC Jan. 10, 2019 Interview*, *supra*.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS
CODE - 4:20-cv-03686-HSG                                                          - 22 -

1
2
3

balance sheet.  That's [point] 1 – [point] -2 at the time when that investment occurred, the market went down 4,000 points.  It's a spectacular achievement.  **But more importantly, it's above and beyond – our balance sheet has north of 6 billion on it.  It's above and beyond what we need to fund the company for the next four to five years**.

4   66.   This highlighted statement was false or misleading at the time, as Neumann knew.

5   Neumann personally worked on the warrant deal and knew that the January 2019 warrant was

6   unfunded, leaving WeWork in a precarious financial condition following the collapse of the $15-$20

7   billion funding deal that fell apart in December 2018.

8   67.   In fact, after Softbank installed new leadership at WeWork (Softbank COO Claure),

9   on October 23, 2019, he told employees at an all-hands meeting that WeWork was "***on the verge of***

10   ***running out of cash***."[49]  He reiterated, "[w]e're a story of an IPO with a high valuation, and we're

11   also a story that ***in two weeks we're going to run out of cash***."  *Id.* at 8.

12   68.   In addition – as WeWork admits in court filings – SoftBank's decision to "suddenly

13   abandon" its plans to invest $15-$20 billion in WeWork in December 2018 left WeWork "***in the***

14   ***lurch without an alternative source of funding***."[50]  Neumann personally worked on both the $15-

15   $20 billion deal that fell apart in December 2018 and the January 2019 $1.5 billion unfunded warrant

16   transaction.  Clearly, Neumann was one of the executives who knew that WeWork was left "in the

17   lurch" as a result of the failed $15-$20 billion deal.

18   69.   More facts show Neumann knew that WeWork was going to run out of cash in short

19   order unless he raised more money quickly.  Shortly after his appearance on *CNBC*, Neumann stayed

20   at his $21 million home in Corte Madera, California, as he sought more capital from San Francisco

21   Bay Area investors.  He tried to raise new money from a host of sources – including Apple, Google,

22   Salesforce, or their senior managers.  He had lunch with all of them for the purpose of raising more

23   money around the same time he told *CNBC* that the SoftBank investment gave WeWork "***above and***

24   ***beyond what we need to fund the company for the next four to five years***."[51]

25

26   [49]   Ghaffary, *supra* at 18.

27   [50]   *The We Co.*, 2020 WL 1820688, at ¶31.

28   [51]   *CNBC Jan. 10, 2019 Interview*, *supra*.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS
CODE - 4:20-cv-03686-HSG                                                                                           - 23 -

70.     WeWork's financial statements so thoroughly obscured WeWork's desperate cash condition that financial professionals from Harvard Business School could not completely discern how bad the situation was.  Harvard Business School Lecturer on Real Estate and Venture Capital Nori Gerardo Lietz ("Professor Lietz"), published a paper on September 18, 2019, about this subject and many others, titled "Why WeWork Won't."[52]

71.     One of the many questions Professor Lietz sought to answer after reading WeWork's Form S-1, filed (publicly) with the SEC on August 14, 2019, concerned how much cash WeWork consumed.  The short answer: "Given the financial disclosures it is virtually impossible to estimate WeWork's future cash requirements." *Id.* at 14.  But Professor Lietz was able to show that financial losses widened in lockstep with revenue despite WeWork's representations about favorable operating margins and high occupancy rates at its properties (87% leased). *Id.* at 12.  ("Path to profitability?")  Professor Lietz concluded that if these and other WeWork representations "are accurate, the gap between the rate of top line revenue growth and the rate of loss should be shrinking.  Obviously, that isn't the case." *Id.*  These facts further demonstrate what would have been obvious to Neumann in January 2019: WeWork did not have "above and beyond" the amount of cash it needed "to fund the company for the next four to five years" as Neumann claimed, falsely.[53]

**B.     Neumann Falsely Touts the Strength of WeWork's Business Model, Knowing WeWork Was Running Out of Money Quickly**

72.     On January 10, 2019, Neumann also made false or misleading statements about WeWork's revenue run-rates and related cost savings that purportedly induced customers to bring their leasing business to WeWork (*id.*):

> CNBC REPORTER: Well, what I, how I want to frame this question is walk me through what happens in a ***downturn***, what the strategy is, ***how the business model works when you're holding on to long-term leases and your short-term revenue is disrupted***, which –

---

[52]  *See* Nori Gerardo Lietz & Sean Bracken, *Why WeWork Won't*, Harvard Business School Working Knowledge, Sept. 18, 2019 (hereinafter "*Lietz 2019*").  Professor Lietz conducts a thorough analysis of this question: "How Much Cash Will WeWork Need in the Next 18 Months?" *Id.*

[53]  *CNBC Jan. 10, 2019 Interview*, *supra*.

ADAM NEUMANN: I'll share with a few – first of all, great question.  I'll share a few things.  Number one, over the last, in Q4 of 2018, we've seen a big drop in the market.  ***WeWork has never grown faster***.  And our biggest growth is with enterprise.  And enterprise gives us long-term contracts.

*So, as of today, we finished the year at a run rate of 2.5 billion [revenue] – actually a little above, but we haven't closed our books – so, 2.5 billion plus. We're now sitting on 2.4 billion dollars of total contract value forward, meaning signed agreements with enterprise companies that are committed to being WeWork over the next three years, starting immediately.*

So, the entire amount of sales of 2018 is already done for 2019.  As that occurs, that already represents 40 percent of our business, on its way to 60.

\*          \*          \*

ADAM NEUMANN: So, I'll go back to – I'll answer your question for the US.  So, we have never had more long-term commitments than before.  ***Our enterprise business is growing faster than ever before***.  Our one-person companies, the ones who do get month to month, there is not vacancy.  They have never gone in faster. And in the past three months, ***which there was not a downturn, but the beginning of a pull-back, we have never grown faster***.

We see a direct correlation between when the world starts pulling back – why?  ***Because when WeWork sells a desk to a CFO of a public company, it's 50 percent less than what it would cost for that public company to do it***.  So, the first thing in a downturn, you cut your cost.  The – how do you cut –

CNBC REPORTER: You would be cutting your cost.

ADAM NEUMANN: No.  If you're a company.

CNBC REPORTER: If you're a company.  Okay.

ADAM NEUMANN: If you're a public company.  First thing you're doing is you cut your cost.  CEO walks into the door and says, Mr. CFO, lower my cost.  First thing he does is, what s my highest cost?  In most companies, number one or number two cost is the cost of employees being in real estate.

Neumann's statements about how WeWork's business model would fare in a downturn were false or misleading at the time he made them.

73.     Professor Lietz studied the interrelated cost savings and revenue subjects that Neumann addressed.  Professor Lietz considered the costs saved by members and explained that "just because the member doesn't incur the costs doesn't mean they simply disappear."[54]  She then explained that WeWork enters into "revenue sharing" with landlords who frequently pay to build out WeWork's spaces for WeWork's enterprise clients (large companies) that accounted for a growing

---

[54]   *Lietz 2019*, at 10.

share (40%-60%) of WeWork's business, according to Neumann.  In 2018, WeWork received 33%-36% of its build-out costs from landlords or enterprise clients.  As Professor Lietz explains, however: "WeWork has to bear the cost or enter into revenue sharing arrangements with their landlords or give a rent concession to their Enterprise member."  *Id.* at 11.  While these practices lower current losses to the Company, "in the long term these revenue sharing arrangements will have an impact on top line revenues."  *Id.*  "To extrapolate the growth rate of top line revenues from the past growth rates may be misleading without understanding the impact of these revenue sharing arrangements."  *Id.*

74.   The cost of building out WeWork's high-end spaces was almost $3 billion in 2018, but landlords paid for $1.5 billion of the improvements.  *Id.*  These are the improvements WeWork had to make from a brand point of view – *i.e.*, a high-end office space – *while* also offering the 50% discounts to market costs that Neumann touted in his interview.  WeWork's revenue share with landlords effectively created $1.5 billion worth of new debt that the landlords would cover over time in exchange for absorbing those costs up front.

75.   Even with the revenue-sharing arrangements, WeWork *still* booked $1.9 billion in current losses in 2018.  *Id.* at 2.  This occurred in substantial part due to the fact that WeWork was systematically underwriting unprofitable leases on the back of fabricated underwriting metrics – a tactic WeWork pursued to meet Son's and Neumann's growth-at-any-cost business model.  That is not a business model that can grow fast in a downturn without facing insolvency.  Indeed, WeWork only had *two weeks'* worth of cash left to run its entire business by the end of October 2019 – and the economy was relatively sound at that point.  Neumann's statements were false or misleading for all of these reasons.

C.   **Neumann Hypes WeWork's Prospects Before 10,000 Employees in Los Angeles in January 2019, as He Had on Prior Occasions**

76.   Also on or about January 10, 2019, Neumann made a series of presentations touting the Company's growth and business to a gathering of over 10,000 employees – comprising existing or potential investors – at the Los Angeles Convention Center.

77.     Similar to Neumann's statements to *CNBC*, Neumann's presentations emphasized the Company's fast revenue growth and profitable business model that generated a portfolio of buildings that were all profitable.  He further stated that the Company was growing and lowering expenses due to the proprietary data analytics.  Neumann further stated that WeWork had completed a round of funding that valued the Company at "$47 billion" and that WeWork had enough capital to last "years," which gave WeWork a "safety net" going forward.

78.     Neumann's presentations were false or misleading by omission because, by this point in time, the fabrication of leasing metrics substantially contributed to the growth of WeWork's core business while WeWork designed ways to conceal the true earnings impact of the underwriting fabrication from investors.  *See infra* §IV.  In addition, WeWork did not have enough capital to last "years," as Neumann represented, but was, in fact, quickly running out of money, as Neumann knew before he made substantially similar statements to *CNBC* on January 10, 2019.  *See* §VII.B.  His statement about completing funding that valued WeWork at "$47 billion" also was false or misleading because, as Neumann knew, a spurious warrant transaction created that purported value in order to inflate WeWork's perceived valuation before an IPO, as discussed above.  *See infra* §VI.

**D.     SoftBank Joins Neumann in Hyping the "Dramatic" Profitability of WeWork's Business Model**

79.     SoftBank touted WeWork's business model as WeWork prepared for its IPO.  Son gave a televised interview to *CNBC* on March 8, 2019.  He stated to *CNBC*:[55]

> SON: . . . While you are increasing productivity and excitement, at the same time, ***cost of the [] office expense goes down on the average like 40%.  So from CFO point of view and CEO point of view it's great to have a 40% reduction in cost***.  And, at the same time, employees' satisfaction of the workplace increase[s] dramatically, like 30% increase in happiness of work[] place.  It's beauty on both sides.

> *CNBC* REPORTER: But right now [WeWork is] losing money.

> SON: Accounting-wise.  Because ***they're growing so quickly and they're investing into the capex, right***?  But it's a recurring revenue.  It's an ongoing recurring revenue.  It's like a subscription.  You know the subscription of a magazine or a newspaper and now Netflix.  Netflix is still losing money but the value of the company is tremendous compared to other media companies.

---

[55]  CNBC, *Masa Son on Softbank's WeWork Investment*, Youtube.com (Mar. 8, 2019), https://www.youtube.com/watch?v=eDpdcWz_F_0.

1    REPORTER: It is based on the ability to continue to attract subscribers.

2    SON: Yes, subscribers growing and recurring.  And so the *initial investment* is just
     the initial investment.  And Facebook was losing money even post-IPO for a while.
3    *Once they start making money it's dramatic*[.] because the basic cost of the
     customer acquisition or innovation is not that growing exponential – it's almost flat.
4    So *initial cost* is high . . . *but the revenue from the recurring subscription grows
     exponentially*.

5

6    These statements, substantially similar to the statements that Neumann made to *CNBC* on January

     10, 2019, quoted above, were false or misleading for substantially the same reasons.
7
            80.    Son knew the statements were false because: (1) Son and SoftBank had recently
8
     worked with Neumann directly to arrange the $1.5 billion warrant that inflated WeWork's valuation
9
     to $47 billion in January 2019; (2) Son and SoftBank had access to all of the due diligence that his
10
     San Francisco Bay Area team had conducted on WeWork during the period leading up to that
11
     transaction, which, again, he was personally involved in negotiating with Neumann; and (3) "Son
12
     and SoftBank possessed extensive knowledge of the Company's financial condition before it agreed
13
     to the [w]arrant" in January 2019, as WeWork admits in its court filings.[56]  WeWork has also stated
14
     that "throughout its time as an investor in the Company, SoftBank [has] sought to advantage itself to
15
     the detriment" of all other investors, which, in this case, consisted of issuing a warrant for the
16
     purpose of inflating WeWork's valuation.  *Id.* at ¶40.
17
     **VIII.   Additional Facts Show Scienter**
18
            **A.    Financial Incentives Support Scienter**
19
            81.    Stock sales support scienter.  Neumann sold $361 million in stock in 2017.  He also
20
     secured a $500 million line of credit from banks in exchange for Neumann pledging WeWork
21
     common stock; Neumann had drawn down $380 million from that credit line by July 31, 2019.  That
22
     transaction is substantially similar to a stock sale.  Both transactions corroborate scienter.  Professor
23
     Lietz explains: "For the all the obvious reasons large sales by founders prior to an IPO are distinctly
24
     frowned upon. Why the Board would allow this to happen is a mystery when they clearly know it
25
     would be bad optically."[57]
26

27   [56]  *The We Co.*, 2020 WL 1820688, at ¶41.

28   [57]  *Lietz 2019*, at 16.

82.     Once more facts about WeWork became public in the course of its failed public offering, SoftBank started writing down the value of its investment in WeWork – from $10.3 billion to $1.1 billion, for a 90% loss in November 2019.  Yet SoftBank had access to WeWork's inner workings and financial condition years before it took that write-down – including by way of the due diligence it conducted in the period leading up to its decision not to give WeWork $15-$20 billion in December 2018.   Those same facts would have informed SoftBank's decision to extend the unfunded warrant to WeWork in January 2019 to inflate WeWork's valuation in advance of its attempted public offering.  *The Wall Street Journal* explains: "SoftBank's first Vision Fund has pushed up the valuations of many unicorns—private companies valued at more than $1 billion" such that "SoftBank has booked profits from its investments in shared-office-space company WeWork and [another company] partly because it has kept pouring money into the companies at escalating valuations."[58] The result is that these "paper revaluation gains count as operating income in the parent's results."  *Id.*   The opposite is also true: writing down WeWork wrote down SoftBank's profits.

**B.      Self-Dealing and Corporate Governance Failures Support Scienter**

83.     Self-dealing by Neumann corroborates scienter.  There are myriad examples.  To cite one, Neumann trademarked the word "We" before a different entity took over the business and changed its name to "The We Company."   Then Neumann charged The We Company nearly $6 million to use the purported trademark – "We."  *Axios* labeled Neumann's conduct "egregious," explaining, "[t]here is just zero defense here, even if Neumann originally planned to use the trademark for unaffiliated businesses and it subsequently gained in taxable transfer value because of WeWork.  It's abusive of the company's balance sheet."[59]

84.     Neumann – with the Board's approval – bought stakes in buildings for his own personal account and then had WeWork lease the buildings.  Corporations bar executives from such

---

[58]  Jackie Wong, *Why Softbank Needs a Second Vision Fund*, The Wall Street Journal (Aug. 7, 2019), https://www.wsj.com/articles/why-softbank-needs-a-second-vision-fund-11565182992.

[59]  Dan Primack, *Axios Pro Rata: Top of the Morning*, Axios (Aug. 21, 2019), https://www.axios.com/newsletters/axios-pro-rata-5f36d822-103b-41f2-a8d0-de1ab20f5020.html.

self-dealing as a standard operating procedure.  Here, however, a representative of SoftBank was on the Board and approved the deals.

85.     Neumann further exploited his position within WeWork to enrich his friends and family at investors' expense.  As *The Wall Street Journal* recently reported in an article titled, "The Money Men Who Enabled Adam Neumann and the WeWork Debacle":[60]

> [Neumann] had always been open about hiring friends and family.  WeWork's executive ranks included his wife, Rebekah Neumann, the company's chief brand officer.  ***Mr. Neumann once told staff the board strongly resisted hiring Ms. Neumann, but he persevered, telling directors they could have both Neumanns at WeWork, or neither.***
>
> At an executive retreat in Montauk on Long Island, Mr. Neumann once raised a glass in a toast "to nepotism," attendees said.

WeWork's August 14, 2019 prospectus revealed that in the event Neumann died or became permanently disabled, his wife would be largely in charge of selecting his successor.  The fact that the Board delegated the decision to Neumann's family member is highly irregular and is another fact that shows a lack of oversight by the Board.

86.     Neumann's self-dealing – in the form of selling the word "We" to WeWork for $6 million and appointing family members to senior positions at WeWork with all the attendant authority those positions carry – shows a lack of meaningful oversight by the Board and a lack of accountability by Neumann.  These facts support scienter because they reflect the conditions in which corporate misconduct flourishes, as it did in this case.

## IX.     Loss Causation and Plaintiffs' Economic Damages

87.     As detailed herein, WeWork's business model was fundamentally unprofitable; and the Company's expansion efforts during the Class Period simply worsened its negative cash flows and pushed profitability further out of reach, necessitating constant capital infusions from outside investors.  Initially, WeWork was able to raise sufficient sums from private investors.  However, as the Company turned to public markets, new disclosures uncovered the false or misleading nature of defendants' Class Period statements and omissions and revealed the fact that defendants had used

---

[60]   Eliot Brown & Maureen Farrell, *The Money Men Who Enabled Adam Neumann and the WeWork Debacle; Veteran executives and financiers helped fuel WeWork's spectacular rise and fall, pouring in capital while ceding control to its founder*, The Wall Street Journal, Dec. 14, 2019, at 4.

1  spurious devices – such as the unfunded January 2019 warrant – to inflate WeWork's apparent

2  economic value by improper means.

3       88.    WeWork's true value started to come to light in August 2019.  On August 14, 2019,

4  the Company publicly filed its 383-page prospectus with the SEC in advance of its attempt to sell

5  stock to the public.  Investors, financial media, and finance academics began scrutinizing the

6  document.  That process resulted in myriad news reports about WeWork's business model, finances,

7  and governance.

8       89.    *The Wall Street Journal* wrote a retrospective report about the events that had

9  transpired between August and October 2019.  The October 24, 2019 report's title summarizes the

10 events well:  "The Fall of WeWork: How a Startup Darling Came Unglued – The cliff dive has little

11 precedent, even in the boom-and-bust world of venture capital."[61]  WeWork's August 14, 2019

12 prospectus "put its inner workings on display" and "detailed a company with swelling losses, no

13 clear path to turning a profit and a history of self-dealing by its CEO," defendant Neumann.  *Id. The*

14 *Wall Street Journal* further reported: "While ***WeWork executives had boasted about their***

15 ***impressive cash pile as recently as this spring, the reality was more troubling***.  The company could

16 run out of funds as soon as November, more than five months more quickly than analysts had

17 projected," based upon the prospectus.  *Id.*

18      90.    One such analyst, Professor Lietz, had analyzed the August 14, 2019 prospectus; in

19 her paper entitled, "Why WeWork Won't," she demonstrated that WeWork's financial statements

20 and related disclosures presented "[c]ryptic, missing and opaque disclosures equat[ing] to misleading

21 information.":[62]

22          The teeter-totter image in the Prospectus is inadvertently the best possible
           metaphor for the Company.  WeWork has to successfully complete this IPO.  It is
23         hemorrhaging cash at an alarming rate notwithstanding its explosive growth in terms
           of new members.  It is notable that the new loan agreement WeWork reached with its
24         lender consortium is contingent upon successfully raising $3 billion in the IPO.

25

---

26 [61]  Maureen Farrell, Eliot Brown, et al., *The Fall of WeWork: How a Startup Darling Came Unglued*, The Wall Street Journal (Oct. 24, 2019), https://www.wsj.com/articles/the-fall-of-wework-

27 how-a-startup-darling-came-unglued-11571946003.

28 [62]  *Lietz 2019*, at 21.

There are substantial cash reserve requirements in the proposed lending arrangement as described in the Prospectus.

If the IPO is not successful and the loan agreement is not closed, WeWork is in trouble absent another equity infusion from SoftBank.  SoftBank may not want the IPO to proceed as it would have to mark to market their position on their balance sheet and in the Vision Fund.  This may make life complicated as they are in the process of raising their next fund.  Unless SoftBank is willing to cut WeWork loose, they may have no choice but to make another equity infusion and delay the IPO.

*Id*. at 20.

91.     Professor Lietz also prepared an illustration that showed not just the fact of "losses," which often accrue in companies that are just getting started, but that WeWork's losses were accelerating at a rate that showed WeWork's business model was driving the Company into insolvency quickly (*id*. at 3):



**Figure 1.  WeWork's Top Line Revenue and EBITDA Loss Growth Rates**[ii]

Source: Authors

92.     In August 2019, WeWork continued pricing its stock at the enterprise valuation of $47 billion, which defendants had manufactured via the January 2019 unfunded warrant, related misstatements, and their scheme to present the Company as a more profitable business than it was in fact.  Over the weeks that followed the filing of WeWork's August 14, 2019 prospectus, the

Company's valuations plummeted.  By September 30, 2019, after weeks of intense scrutiny, WeWork pulled its public offering.

93.    As WeWork now admits in court filings: "The Company's valuation, which had been reported to be $47 billion in January 2019 based on the $110 per share valuation implied by the Warrant, declined significantly during this time.  By October 2019, the Company was faced with the imminent prospect of running out of money."[63]  This admission implies a WeWork valuation closer to that of a bankrupt company with more liabilities than assets – closer to $0 than $47 billion.  The *Financial Times* illustrates this point:[64]



94.    Simply put, WeWork was on the verge of insolvency.  In October 2019, SoftBank removed Neumann from WeWork after agreeing, for example, that WeWork would pay him a $185 million consulting fee.  Son's senior lieutenant, Claure, made that agreement with Neumann and took over a senior leadership role.  On his first day on the job, October 23, 2019, Claure held a

---

[63]  *The We Co.*, 2020 WL 1820688, at ¶33.

[64]  Platt, et al., *supra* at 3.

1  meeting with WeWork's rank-and-file employees, where he admitted that WeWork was "a story of

2  an IPO with a high valuation, and we're also a story that in two weeks we're going to run out of

3  cash."[65]

4      95.   WeWork was on the verge of insolvency because its core business model rested on

5  unprofitable leases and hundreds of millions of dollars in expenses wasted on unprofitable

6  acquisitions (*e.g.*, a company that literally created waves at its business because Neumann liked to

7  surf), wasteful perks for Neumann (*e.g.*, a top-of-the-line private jet), pet projects for Neumann's

8  wife (*e.g.*, a new school for their children; meaning they literally built a new school with Company

9  assets), and rampant self-dealing (*e.g.*, buying the word "We" from Neumann for $6 million after

10 Neumann "trademarked" the word), including hundreds of millions of dollars' worth of real estate

11 transactions that involved Neumann: (1) buying buildings with others; and then (2) leasing those

12 same buildings back to WeWork while he was WeWork's CEO.  The press reviewed this "monetary

13 bonfire" and reported that WeWork "might be the most spectacular implosion of a business in U.S.

14 history."[66]  But not for Neumann.

15     96.   SoftBank "agreed to take a majority stake in WeWork after securing a deal that could

16 hand co-founder Adam Neumann a nearly $1.7 billion windfall and sever most of his ties with the

17 troubled office-space startup," as *The Wall Street Journal* reported on October 22, 2019.[67]  Neumann

18 was set to receive the windfall as part of a SoftBank deal that would enable it to exercise even more

19 control over the Company, much as Professor Lietz predicted.  *See infra* at ¶90.  One corporate

20 governance consultant put Neumann's windfall into context: "'There used to be crazy departure

21

22

23

---

[65]  Ghaffary, *supra* at 18.

24

[66]  Megan McArdle, *The WeWork Story is so bizarre we can't even get outraged about it*, The
25 Washington Post (Oct. 25, 2019), https://www.washingtonpost.com/opinions/the-wework-story-is-
so-bizarre-we-cant-even-get-outraged-about-it/2019/10/25/85774d58-f743-11e9-ad8b-
26 85e2aa00b5ce_story.html.

27 [67]  Maureen Farrell and Eliot Brown, *SoftBank to Boost Stake in WeWork in Deal That Cuts Most
Ties with Neumann*, The Wall Street Journal (Oct. 22, 2019), https://www.wsj.com/articles/softbank-
28 to-take-control-of-wework-11571746483.

1    packages in the past, and shareholders really objected,'" but that the consultant "'haven't seen

2    anything that bad in a while.'"[68]

3          97.    For "more than 90% of current and former employees," however, the still-inflated $8

4    billion valuation implied by the SoftBank deal was "below the grant price for stock awards and

5    options they hold," according to former WeWork executives.  *Id.*  The prospect of WeWork's

6    continued growth in valuation had been tempting for many employees in deciding to work for

7    WeWork.  *Id.*  "Former employees have privately expressed frustration that they exercised stock

8    options when they left the company in the past few years, meaning they bought the stock at the grant

9    price thinking that the stock's value was worth much more, only to see it plummet recently."  *Id.*  "'I

10   know employees who went out of pocket to exercise those options – so those people have the most

11   to lose in this type of situation,' said Zach Aarons, co-founder of venture-capital firm MetaProp and

12   a We shareholder.  'They would have been better off by not buying in the first place.'"  *Id.*  Indeed,

13   as an analyst at Redex Holdings explained: "'[e]very writedown [by SoftBank of WeWork's

14   valuation] takes WeWork's carrying value closer to reallity.  Clearly the value is zero.'"[69]  Yet

15   WeWork was not alone in inducing investors to buy into the Company at valuations well above its

16   true value during the Class Period.

17         98.    Even WeWork admits that SoftBank is also responsible for inflating WeWork's stock

18   value on the back of reckless growth.  WeWork states as much in its court filings: "SoftBank was far

19   from blameless in the Company's failed IPO and subsequent financial challenges.  As SoftBank

20   deepened its investment in the Company, it pressed for the Company to grow at all costs," and,

21   quoting *The New York Times*, "'poisoned the ecosystem for young companies by encouraging

22

23

24

---

25   [68]   Eliot Brown, *WeWork Employee Options Underwater as Ex-CEO Reaps*, The Wall Street
26   Journal (Oct. 23, 2019), https://www.wsj.com/articles/wework-employees-feel-sting-as-ex-ceo-
     stands-to-reap-11571870011.

27   [69]   CNBC, *Softbank to write down WeWork by $6.6 billion, compounding portfolio misery*,
     CNBC.com (Apr. 30, 2020), https://www.cnbc.com/2020/04/30/softbank-to-write-down-wework-
28   by-6point6-billion-compounding-portfolio-misery.html.

1   founders to take excessive risks with little regard for building businesses that can last through the

2   ups and downs of the economy.'"[70]

3       99.    In this case, as a result of defendants' violations of law, plaintiffs and other members

4   of the Class have suffered collectively hundreds of millions of dollars in losses.

5   **CLASS ACTION ALLEGATIONS**

6       100.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

7   of Civil Procedure and seek certification of the following class: All persons who, directly or

8   indirectly, purchased WeWork securities during the Class Period (the "Class").  Excluded from the

9   Class are defendants and their immediate families, the officers and directors of WeWork and

10  members of their immediate families, their legal representatives, heirs, successors or assigns, and

11  any entity in which defendants have or had a controlling interest.

12      101.    The members of the Class are so numerous that joinder of all members is

13  impracticable.  Plaintiffs believe that there are several hundred members in the Class.  Members of

14  the Class may be identified from records maintained by defendants.

15      102.    Plaintiffs' claims are typical of the claims of the members of the Class as all members

16  of the Class are similarly affected by defendants' wrongful conduct as alleged herein.

17      103.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

18  and have retained counsel competent and experienced in complex class litigation.

19      104.    Common questions of law and fact exist as to all members of the Class and

20  predominate over any questions solely affecting individual members of the Class.  Among the

21  questions of law and fact common to the Class are: (a) whether defendants misrepresented material

22  facts; (b) whether defendants' statements omitted material facts necessary to make the statements

23  made, in light of the circumstances under which they were made, not misleading; (c) whether

24  defendants knew or had reasonable grounds to believe that their statements were false or misleading;

25  (d) whether defendants' statements were made to induce the purchase of WeWork securities by

26  others; and (e) the extent of damage sustained by Class members.

27

28    [70]  *The We Co.*, 2020 WL 1820688, at ¶34.

105.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joining all Class members is impracticable, and this action will be manageable as a class action.

## COUNT I

### For Violation of Cal. Corp. Code §§25400(d) and 25500
### (Against All Defendants)

106.    Plaintiffs incorporate ¶¶1-105.

107.    Defendants directly and/or indirectly, for the purpose of inducing the purchase of WeWork securities by others, engaged in manipulative transactions and/or made or materially participated in making the statements alleged in this complaint, each of which contained false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

108.    Defendants were aware that the relevant statements and omissions were false and misleading and that the relevant transactions were manipulative.

109.    Each of the defendants sold or offered to sell WeWork securities and/or willfully participated in the relevant manipulative transactions for the purpose of inducing the purchase of WeWork securities by others.  Each of the defendants willfully participated in making statements that were false and misleading, or that omitted material facts necessary to make the statements made not false or misleading, and each defendant knew such statements were false and misleading as detailed herein.

110.    As a result of defendants' misconduct, plaintiffs and the other members of the Class have suffered damages because they paid prices for WeWork securities that were affected by defendants' misrepresentations and omissions.  At the time of the purchases by plaintiffs and the members of the Class of WeWork securities, the fair market value of such securities was substantially less than the prices paid by them.

111.    As a direct and proximate result of defendants' violation of law described herein, plaintiffs and members of the Class have been damaged.

**COUNT II**

**For Violation of Cal. Corp. Code §§25401 and 25501**
**(Against Defendants WeWork and Neumann)**

112. Plaintiffs incorporate ¶¶1-111.

113. This claim is brought on behalf of those Class members who purchased WeWork securities from WeWork and/or Neumann.

114. Defendant WeWork and Neumann offered to sell and/or sold securities to plaintiffs and members of the Class in and from this state by means of written and oral communications that included untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading.

115. The defendants named herein failed to exercise reasonable care to ensure the truth and accuracy of such statements, and plaintiffs had no knowledge of the falsity of such statements.

116. As a direct and proximate result of WeWork's and Neumann's violations of law described herein, plaintiffs and members of the Class have been damaged.

**COUNT III**

**For Violation of Cal. Corp. Code §25504**
**(Against Defendant Softbank and Neumann)**

117. Plaintiffs incorporate ¶¶1-116.

118. This claim is brought on behalf of those Class members who purchased WeWork securities from WeWork and/or Neumann.

119. Each of the defendants named herein directly or indirectly controlled a person liable under §25501, and/or is a partner, executive officer or director (or occupies a similar status or performs similar functions) of a firm or corporation so liable, or is an employee of a person so liable.

120. Each of these defendants materially aided in the act or transaction constituting the violation of §25501 and knew or had reasonable grounds to believe in the existence of the facts by reason of which the liability exists.

1

**PRAYER FOR RELIEF**

2

WHEREFORE, plaintiffs pray for judgment as follows:

3

A.     Determining that this action is a proper class action, certifying plaintiffs as Class

4

representatives under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiffs'

5

counsel as Class counsel;

6

B.     Awarding compensatory damages in favor of plaintiffs and the other Class members

7

against all defendants, jointly and severally, for all damages sustained as a result of defendants'

8

wrongdoing, in an amount to be proven at trial, including interest thereon;

9

C.     Awarding rescission or a rescissory measure of damages;

10

D.     Disgorgement of defendants' ill-gotten gains;

11

E.     Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this

12

action, including counsel fees and expert fees; and

13

F.     Awarding such other and further relief as the Court may deem just and proper.

14

**JURY DEMAND**

15

Plaintiffs demand a trial by jury.

16

DATED:  September 4, 2020                     ROBBINS GELLER RUDMAN
                                                                & DOWD LLP
17                                                            SHAWN A. WILLIAMS
                                                              JASON C. DAVIS
18

19
                                                                   s/ Jason C. Davis
20                                                            JASON C. DAVIS

21                                                            Post Montgomery Center
                                                              One Montgomery Street, Suite 1800
22                                                            San Francisco, CA  94104
                                                              Telephone:  415/288-4545
23                                                            415/288-4534 (fax)
                                                              shawnw@rgrdlaw.com
24                                                            jdavis@rgrdlaw.com

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
 & DOWD LLP
DARREN J. ROBBINS
TRAVIS E. DOWNS III
BRIAN E. COCHRAN
JUAN CARLOS SANCHEZ
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
travisd@rgrdlaw.com
bcochran@rgrdlaw.com
jsanchez@rgrdlaw.com

Attorneys for Plaintiffs

1

## DECLARATION OF SERVICE BY EMAIL

2

3

4

I, Jason C. Davis, not a party to the within action, hereby declare that on September 4, 2020, I caused to be served the attached **CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CORPORATIONS CODE** on the parties in the within action by email addressed as follows:

| | | |
|---|---|---|
| Maeve L. O'Connor<br>Elliot Greenfield<br>Morgan A. Davis<br>DEBEVOISE & PLIMPTON LLP<br>919 Third Avenue<br>New York, New York 10022<br>Telephone:  212/909-6000<br>212/909-6000 (fax) | *Counsel for Defendant*<br>*The We Company* | mloconnor@debevoise.com<br>egreenfield@debevoise.com<br>mdavis@debevoise.com |
| Warren Metlitzky<br>Courtney C. Aasen<br>CONRAD & METLITZKY LLP<br>Four Embarcadero Center, Suite 1400<br>San Francisco, California 94111<br>Telephone:  415/343-7100 | | wmetlitzky@conradmetlitzky.com<br>caasen@ conradmetlitzky.com |
| Jaren Janghorbani<br>Paul Paterson<br>PAUL, WEISS, RIFKIND,<br>   WHARTON & GARRISON LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Telephone:  212/373-3000 | *Counsel for Defendant*<br>*Adam Neumann* | jjanghorbani@paulweiss.com<br>ppaterson@paulweiss.com |
| Steven Kaufhold<br>KAUFHOLD GASKIN LLP<br>388 Market Street<br>San Francisco, CA<br>Telephone:  415/445-4621 | | skaufhold@kaufholdgaskin.com |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Erik J. Olson<br>MORRISON & FOERSTER<br>755 Page Mill Road<br>Palo Alto, CA 94304<br>Telephone:  650/813-5600 | *Counsel for Defendant*<br>*SoftBank Group Corp.* | ejolson@mofo.com |
| --- | --- | --- |
| Mark R.S. Foster<br>MORRISON & FOERSTER<br>425 Market Street<br>San Francisco, CA 94105<br>Telephone:  415/268-7000 | | mfoster@mofo.com |

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 4, 2020, at Larkspur, California.

s/ Jason C. Davis
JASON C. DAVIS